472 So.2d 578 (1985)
SUCCESSION OF Henry Crawford BARTIE.
No. 85-CA-0521.
Supreme Court of Louisiana.
June 28, 1985.
*579 David J. Williams, Lake Charles, for plaintiff-appellee.
C.A. Miller, Jr., Richard Savoy, Lake Charles, Isaac E. Henderson, Baton Rouge, for defendant-appellant.
CALOGERO, Justice.
This civil appeal is from a trial court judgment in plaintiffs' favor which held that La.C.C. art. 1493, prior to its amendment in 1981, was unconstitutional insofar as it treated illegitimate children differently from legitimate children, granting only the latter the right of forced heirship.
Henry Crawford Bartie died testate on August 4, 1977. He had never married. In his statutory will, dated October 23, 1974, Bartie named a nephew, Roland Mouton, a particular legatee and bequeathed to him certain immovable property. He named another nephew, Bryant Bartie, Jr., residuary legatee, and bequeathed to him the remainder of his property. The will was probated, and on April 17, 1978, a judgment of possession was signed in favor of Mr. Bartie's two nephews, Roland Mouton and Bryant Bartie, Jr., in accordance with the provisions of the will.
On November 13, 1980, August Bartie, Olivia Bartie Fontenot, and Robert Lee Bartie filed a petition for reduction of excessive donations. They claimed to be the acknowledged illegitimate children of Henry Crawford Bartie and entitled, as forced heirs, to two-thirds of his property. They argued that La.C.C. art. 1493 as then applicable (prior to its amendment in 1981)[1] was unconstitutional in that it gave legitimate children the right to forced heirship but denied that same right to illegitimate children.
After trial on the merits,[2] the trial court, relying on this Court's decisions in Succession of Brown, 388 So.2d 1151 (La.1980) and Succession of Clivens, On Rehearing, 426 So.2d 585 (La.1982), ruled that La.C.C. art. 1493 was unconstitutional insofar as it excluded illegitimate children from the right of forced heirship. The trial court went on to find that the plaintiffs had not been formally acknowledged (which is what was pleaded), but that they had been informally acknowledged by Henry Crawford Bartie, and thus were entitled to be recognized as his legal heirs and to recover two-thirds of the property he owned at his death.
On appeal, defendants present essentially two arguments. First it is argued that the trial court erred in holding La.C.C., art. 1493, prior to its amendment in 1981, unconstitutional. Alternatively, defendants contest the sufficiency of the evidence plaintiffs presented to establish their filiation to Henry Bartie, as well as the standard under which the trial judge assessed *580 that evidence. We find no merit in defendants' arguments and affirm the trial court judgment.
With respect to La.C.C. art. 1493, prior to its amendment in 1981,[3] that article, which the trial judge declared unconstitutional, had provided:
Donations inter vivos or mortis causa can not exceed two-thirds of the property of the disposer, if he leaves, at his decease, a legitimate child; one-half, if he leave two children; and one-third if he leaves three or a greater number.
Under the name of children are included descendants of whatever degree they be, it being understood that they are only counted for the child they represent. (emphasis provided).
Essentially, the article extended the benefits of forced heirship to legitimate children of the deceased but not to his illegitimate children.
It is now well settled that Article I, Section 3 of the 1974 Louisiana Constitution prohibits arbitrary discrimination against a person because of birth, which, of course, includes illegitimacy. Succession of Clivens, supra; Succession of Brown, supra; Succession of Thompson, 367 So.2d 796 (La.1979); Succession of Robins, 349 So.2d 276 (La. 1977). After reviewing the proceedings of the 1973 constitutional convention at which the meaning of Art. I, Sec. 3 of the 1974 La. Constitution was debated, we determined that "the entire range of discriminatory practices based on illegitimacy was encompassed by the section." Succession of Clivens, supra; Succession of Thompson, supra.
Article XII, § 5 of the 1974 Louisiana Constitution provides:
No law shall abolish forced heirship. The determination of forced heirs, the amount of the forced portion, and the grounds for disinherison shall be provided by law. Trusts may be authorized by law, and a forced portion may be placed in trust.
We noted in Succession of Clivens that (b)ecause of the unique nature of Louisiana succession law, which constitutionally requires forced heirship (La. Const. art. XII, § 5), a testator is not free to bequeath all his property to whomever he pleases if he leaves descendants. Descendants have a constitutional, as well as a statutory, right to a forced portion. To deny an illegitimate descendant a forced portion in a testate succession, while affording a legitimate descendant such a right, is as constitutionally impermissible as denying an illegitimate child his right in an intestate succession. There is no basis for making such a distinction and such a holding fosters rather than remedies discrimination against illegitimates. Succession of Clivens, supra at p. 598.
Defendants are correct that Succession of Clivens, supra, and Succession of Brown, supra, dealt with intestate inheritance rights and the discrimination between legitimates and illegitimates (C.C. 919), while the case under consideration involves the differing treatment of legitimates and illegitimates as regards forced heirship in the testate succession (C.C. 1493). Nonetheless, the controlling reasons in Clivens and Brown dictate the same result here.
Arbitrary discrimination against a person based on illegitimacy is prohibited by our 1974 Constitution. The 1974 Constitution, particularly Art. I, Sec. 3, became effective on January 1, 1975. Succession of Clivens, supra. Forced heirship is provided *581 for in our Constitution. There is no basis for allowing a legitimate descendant a forced portion in a testate succession and denying that same right to an illegitimate descendant. Accordingly, the trial court was correct in holding that La.C.C. art. 1493 was unconstitutional insofar as it denied illegitimate descendants a right to a forced portion in their ascendant's estate while granting such right to legitimate descendants.
Defendants' second argument is more persuasive; although not convincing. Plaintiffs filed their petition on November 3, 1980. If they are to recover at all, they must first establish their filiation to Henry Crawford Bartie. In that regard, La.C.C. art. 209, as written in 1980 when the suit was filed, provided in pertinent part:
Art. 209. Methods of proving filiation.
4. A child of a man may prove filiation by any means which establish, by a preponderance of the evidence, including acknowledgment in a testament, that he is the child of that man. Evidence that the mother and alleged father were known as living in a state of concubinage and resided as such at the time when the child was conceived creates a rebuttable presumption of filiation between the child and the alleged father. (Emphasis provided)
By the time the case came up for trial[4] on February 23, 1984, La.C.C. art. 209 had been amended twice, once in 1981 (1981 La.Acts No. 720 § 1) and once in 1982 (1982 La.Acts No. 527 § 1). At the time of trial it provided in pertinent part:
Art. 209. Proof of filiation
B. A child not entitled to legitimate filiation nor filiated by the initiative of the parent by legitimation or by acknowledgment under Article 203 must prove filiation as to an alleged deceased parent by clear and convincing evidence in a civil proceeding instituted by the child or on his behalf within the time limit provided in this article. (Emphasis provided)
Defendants contend that the law applicable to the case is that which was in effect at the time of the trial ("clear and convincing evidence") rather than that which was in effect in 1980 when suit was filed ("preponderance of the evidence"). Defendants argue that the trial judge erred in that he judged the case under the "preponderance" standard rather than under the "clear and convincing" standard.
Plaintiffs do not dispute that the "clear and convincing" standard is applicable to the case. However, they argue that the trial court judgment should not be overturned because the trial judge did weigh the evidence under the "clear and convincing standard" when he considered, and denied, defendants' motion for the new trial. In the alternative, plaintiffs argue that if the Court should find that the trial judge did apply the wrong standard in weighing the evidence the judgment should not be overturned because plaintiffs' filiation to Henry Bartie was proven not only by a preponderance of the evidence but by "clear and convincing" evidence as well.
Plaintiffs' contention that the trial judge assessed the evidence and found it clear and convincing in support of plaintiffs when he denied the motion for new trial, does not have merit. After the trial court rendered its original judgment under the "preponderance" standard of proof, he entertained defendants' motion for a new trial and the argument that he had applied the wrong standard of proof to the evidence in rendering his judgment. In response plaintiffs agreed with defendants that the wrong standard of proof had been applied, but argued that their evidence was sufficient under the "clear and convincing" standard to support the trial court judgment. In the trial court's reasons for denying the motion for a new trial, the trial *582 judge noted the fact that both sides were in agreement that the "clear and convincing" standard of proof was applicable. However, he expressed that he was not certain that they were correct in that regard. He stated that he would take the matter under advisement and study that point. Thereafter, the trial court ruled that "the court is still of the opinion that my original decision is correct, and that the motion for a new trial will be denied." Under these circumstances and the context of the ruling, it appears that the trial judge maintained his position that the evidence was to be judged under the "preponderance" standard and not under the "clear and convincing" standard.
Defendants contend that the trial judge was wrong in this regard and that "clear and convincing" is the appropriate standard of proof. Plaintiffs, perhaps too generously, concede as much, but contend that the evidence supports the finding that they have proven their filiation to Henry Bartie by "clear and convincing" evidence. It is not at all certain, however, that "clear and convincing" is the appropriate standard to apply in this case. Arguably, at least, the amendment to La.C.C. art. 209 in 1982, after plaintiffs filed this lawsuit, increasing plaintiffs' burden in the proof of filiation, is substantive in its effect upon plaintiffs, rather than procedural, and as such, should not be applied retroactively. See Pounds v. Schori, 377 So.2d 1195 (La.1979); Spaht, Persons, Developments in the Law, 1981-1982, 43 La.L.Rev. 535 (1982); Spaht, Persons, Developments in the Law, 1980-1981, 42 La.L.Rev. 404, 409-410. Nonetheless, we need not resolve that legal issue here, for on the record before us we determine that plaintiffs have established their filiation to Henry Bartie by clear and convincing evidence.
The burden of proof where a plaintiff must prove his case by "clear and convincing" evidence is an intermediate one which requires that the fact be proven to a degree greater than that involved in proof by a "preponderance" of the evidence but to a degree less than involved in proof "beyond a reasonable doubt." In other words, the existence of the disputed fact must be highly probable, that is, much more probable than its non-existence. Succession of Lyons, 452 So.2d 1161 (La.1984); LSB v. Edwins, 329 So.2d 437 (La.1976); Sanders v. Sanders, 222 La. 233, 62 So.2d 284 (1952); See also: McCormick on Evidence, Section 340(B) (2d Ed. 1972). In this case the evidence overwhelmingly supports the finding that the plaintiffs are the illegitimate children of Henry Bartie.
The testimony of twenty-two witnesses was presented at trial. Twenty-one of them testified for plaintiffs and only one, defendant Roland Mouton, testified for the defense. Additionally, plaintiffs presented the depositions of three other witnesses in support of their case.
The trial judge correctly noted the following evidence in his reasons for judgment in concluding that the plaintiffs had proven their filiation to Henry Bartie:
Several witnesses were called to testify; each of them seemed to have known the children of Diana Bartie, the mother, and Henry Bartie. Each of the witnesses seemed to have known Henry Bartie well enough to have known him by his nickname of Pat Bartie.
Lou Ella Williams, who is sixty-six years of age, was the niece of Diana Bartie. She testified that Henry Bartie and Diana were associated before the children were born, that Henry Bartie was the only man that she had seen with Diana, that he wasor would come around on many occasions when the children were young, that he and Diana would show their affection for each other by kissing on several occasions which she observed. She further testified that Henry declared to her on many occasions that these three children were his children.
Gladys Harmon stated that Henry Bartie told her that Olivia was his daughter, that he had brought okra to her on occasions and asked for her to give it to Olivia and she would divide it with her brothers.

*583 May Ola Mayne stated that she knew Pat Bartie, and she asked him on an occasion about his children. He told her that he had three children. She knew Olivia, but she did not know the boys.
Reverend Eugene Stewart was born in Cameron and raised with the Bartie children. He heard Henry Bartie state that Robert was his son.
Harry Bishop had known Olivia, and he met the boysor the two boys at the hospital. He stated that Henry had told him that he had the children.
Jessica Bartie, seventy-seven years of age, testified that she had known Pat Bartie, and that he had three children, one girl and two boys.
Jim Mayne knew Henry Bartie, and they worked together for Louisiana Menhaden. Henry would ask him to help on occasions to clean fish for his children.
In addition, the testimony of Henry Hebert and Louisiana Bartie Hebert was submitted by deposition, and in essence that testimony was that Mrs. Hebert was Diana's sister, and that she knew that the petitioners were the children of Diana and Henry Bartie, and that he admitted to her that they were his children.
Lilly Sykes' testimony was also received by deposition, and she knew by what she had been told on many occasions that these were Pat's children. Pat would come by her house about once a week, and Diana had said he was the father, and Pat declared it himself. She related occasions when he would bring sacks of vegetables to her house and ask her to give them to Olivia for Olivia to distribute to the brothers.
Also offered in evidence was the obituary which named the three petitioners as the children of Henry Bartie. The program used in the services at the burial of Henry Bartie was read to the participants by the preacher at the funeral services, and it named the three petitioners as the children of Henry Crawford Bartie.
Also offered as additional evidence was the record of birth of the three children with the name of Henry Barite as the father. The introduction of these documents are merely cumulative in this case.
In addition, there is further evidence in the record to support plaintiffs' claim.
Mr. Rodney Jones, testified that he was married to Diana Bartie's eldest daughter, Leona LeBlanc, whose father was Ezeb LeBlanc. He testified that his deceased wife, Leona, advised him that Pat Bartie was the father of all three of her mother's younger children.
Mrs. Mary J. Dancy testified that she was the cousin of Henry Bartie and by reputation in the community she felt Henry Bartie was the plaintiffs' father.
Mrs. Maybelle Payton Bartie testified that she was married to Raymond Bartie, the brother of Diana Bartie who died prior to trial. She testified also that Pat Bartie told her at church that Olivia Bartie was his daughter.
Mrs. Agnes Bartie, the wife of plaintiff August Bartie, testified that Henry Bartie referred to August as his son on several occasions. Agnes wrote a letter on her own behalf and on behalf of August's daughter, Alida Bartie, to Henry Bartie requesting money for an advertisement in a program, "Jabberwock", put out by Delta Sigma Theta Sorority. The money was delivered to her by Johnny Bartie, Henry's brother. The subsequent advertisement which appeared in "Jabberwock" said "Best Wishes to Alida Beatrice Bartie from your grandfather, Henry Bartie."
The testimony of Olin Fontenot, the husband of plaintiff Olivia Bartie Fontenot, was that Henry Bartie acknowledged Olivia to be his daughter at a family funeral and that he brought okra to Olivia on different occasions.
Mrs. Mary Bargeman had heard talk of Henry, or Pat, Bartie having children.
Mr. Alex Bishop testified that Henry Bartie had three children and their mother was Diana. He on occasion in the past had seen Pat and Diana together in a type of dating relationship. He further testified *584 that August Bartie favored Henry or Pat Bartie and the general reputation in Cameron regarding Henry Bartie was that he had three children.
Mrs. Mabel Bishop testified that Pat Bartie indicated in a conversation with her that he had children.
Plaintiff Olivia Bartie Fontenot's marriage certificate, baptismal certificate and birth certificate were introduced into evidence. They all showed Henry Bartie as her father, although none were signed by Henry. When Henry Bartie was in the hospital he called her "daughter". At the funeral of Henry Bartie, Olivia, August and Robert occupied the front row. Her grandfather and mother had told her Henry Bartie was her father. She had on numerous times addressed Henry Bartie as father, and he never told her not to call him father or that he was not her father. Henry Bartie brought okra to her and visited her after she moved from Cameron to Lake Charles.
Again, although not signed by Henry, plaintiff August Bartie's birth certificate and marriage certificate showing Henry Bartie as his father were introduced into evidence. August testified that he was acknowledged as Henry Bartie's son by Henry Bartie in the presence of Henry's brother, Johnny Bartie.
Plaintiff Robert Bartie's birth certificate and marriage certificate also showed Henry Bartie as his father, but they were not signed by Henry either.
The deposition of Louisiana Bartie Hebert, the sister of plaintiffs' mother, Diana Bartie, was introduced into evidence. Lou Ella Williams, who lived in the same house with plaintiffs' mother when plaintiffs were born, testified at the trial. They both testified that Diana was dating no one but Henry Bartie when the plaintiffs were conceived and after they were born.
As can be seen, plaintiffs offered a great deal of evidence to support their claim that they are the illegitimate children of Henry Bartie. The evidence ranged in time from conception (that Henry was dating their mother at the time each was conceived) through their childhood and into their adult lives. There was a general belief in the community that the three plaintiffs were Henry Bartie's children.
Defendants did not introduce any evidence to rebut the evidence offered by plaintiffs. Defendant Roland Mouton was the only defense witness. And, although he did testify that he had never heard that plaintiffs were Henry's children, he did not testify that they were not.
In summary the uncontradicted evidence presented by plaintiffs shows that it was "highly probable" that Henry Bartie was the father of Olivia Bartie Fontenot, August Bartie and Robert Bartie. Plaintiffs established their case by clear and convincing evidence.

Decree
For the foregoing reasons, the judgment of the trial court holding unconstitutional La.C.C. art. 1493, prior to its amendment in 1981, and granting plaintiffs the rights of forced heirs in and to the testate succession of their father, Henry Bartie, is affirmed.
AFFIRMED.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
I do not consider that La.Civ.Code art. 1493 was unconstitutional prior to its amendment in 1981. Accordingly, I respectfully dissent.
NOTES
[1] The 1981 amendment to La.C.C. art. 1493 (1981 La. Acts No. 884, § 1) deleted the discriminatory language, making the provision applicable to illegitimates as well as legitimates.
[2] The trial court had earlier sustained defendants' exception of no cause of action, relying on our decision, on original hearing, in Succession of Clivens, 426 So.2d 585 (La.1982). In that decision, this Court held that the decision in Succession of Brown, 388 So.2d 1151 (La. 1980), holding La.C.C. art. 919 (prior to its amendment in 1981) unconstitutional insofar as it discriminated against illegitimates in the manner in which they could inherit from their natural fathers, would be applied prospectively only from the date of its rendition, September 3, 1980, in testate successions. However, by the time the trial court ruling was considered on appeal, this Court had rendered its decision on rehearing in Succession of Clivens, supra, which held that Succession of Brown, supra would be applied retroactively to the date the 1974 Constitution became effective, January 1, 1975. Accordingly, relying on the rehearing decision in Clivens, the Court of Appeal reversed the trial court ruling on the defendants' exception of no cause of action and remanded the case to the district court for trial. Succession of Bartie, 434 So.2d 619 (La.App.3d Cir.1983).
[3] In 1981, La.C.C. art. 1493 was amended by La. Acts No. 884, § 1 and now provides:

Donations inter vivos or mortis causa cannot exceed three-fourths of the property of the disposer, if he leaves, at his decease, one child; and one-half, if he leaves two or more children.
Under the name of children are included descendants of whatever degree they be, it being understood that they are only counted for the child they represent.
The 1981 amendment to La.C.C. art. 1493 not only made forced heirship applicable to illegitimates but it also increased the disposable portion limits. However, being substantive in nature, these changes are not applicable to the instant case.
[4] Plaintiffs' filed their petition on November 3, 1980. However, trial in the matter was not held until February 23, 1984. The extended period between the time the petition was filed and the trial date was because of the fact that the trial court had earlier granted defendants' exception of no cause of action and that ruling had been appealed and reversed on appeal and the case remanded for trial. See footnote 2 supra.