LANIER, Judge.
This action is a suit for damages in tort arising out of a two-vehicle automobile accident. The driver of one of the automobiles, Donald H. Willis, filed suit against the driver of the other automobile, Michael D. Letulle. Also made defendants were (1) Letulle’s liability insurer, Cumis Insurance Society, Inc. (Cumis), (2) International Longshoreman’s Association Local 3033, AFL-CIO (the Union), and (3) Willis’ uninsured motorist (UM) insurer, Allstate Insurance Company (Allstate). Cumis filed a reconventional demand against Willis seeking recovery of $5,085 for damages to the Letulle vehicle paid by it. Allstate intervened against Letulle, Cumis and the Union for $23,476.60 for property damage to the vehicle Willis was in and medical payments paid by it. Allstate also crossclaimed against Letulle, Cumis and the Union for all sums for which it might be cast in judgment on its UM coverage. A jury trial resulted in verdicts that (1) Letulle was guilty of fault that was the legal cause of Willis’ injuries, (2) Willis was guilty of fault that was the legal cause of his injuries, (3) Letulle was 50% at fault, (4) Willis was 50% at fault, and (5) the total amount of damages sustained by Willis as a result of his injury was “ZERO”. The trial court judge instructed the jury that “the law requires that if there is a finding of negligence, that the plaintiff be awarded some reasonable damages”, and directed the jury to retire and reconsider its verdicts. The jury deliberated for five more minutes and returned a verdict that Letulle was not guilty of any fault. The trial court rendered a judgment reflecting the jury’s verdict. Willis took this devolutive appeal.
FACTS
Prior to October of 1986, the Union had a contract with the Cooper T. Smith Steve-doring Corporation (Smith Stevedoring). This contract expired at the beginning of October of 1986. At this same time the Willis Barge Cleaning Company, owned and operated by Donald H. Willis, was doing work for Smith Stevedoring. After the Union-Smith Stevedoring contract expired, the Union commenced a strike at a Smith Stevedoring operation near the Darrow community in Ascension Parish, Louisiana. Willis continued to do business with Smith Stevedoring and crossed the Union’s picket lines on a daily basis. To ensure the safety of his employees and himself, Willis would form a motorcade of his employees at his home, and the motorcade would then proceed across the picket line to the Smith Stevedoring work site.
On October 9, 1986, Michael D. Letulle was a Union member and walked the picket line at the Smith Stevedoring operation from midnight to 6:00 a.m. Prior to this time, he had become concerned about vehicles that did not have “respect” for the picket line and got an egg, punched holes in both ends of the egg, blew out the egg yolk and filled the egg with paint. Letulle testified the purpose of the paint-filled egg was to “mess up somebody’s paint job” but it “wasn’t planned for any particular person”. Letulle had the egg with him in his 1982 Toyota Célica when he left the Smith Steve-doring site on the morning of October 9, 1986.
At about 7:30 a.m. on October 9, 1986, Willis formed his workers into a motorcade at his home. He lead the motorcade in a *1050 Corvette automobile owned by his sister, Carol Johnson, and went down Louisiana Highway 941 toward the work site. Willis was driving with the Corvette’s left side window down, and he had his left arm out of the window. As the Letulle and Willis vehicles approached each other from opposite directions, Letulle threw the egg at the Willis vehicle. Willis testified that he saw a hand come out of the window with something “shining” in it, which he thought was a gun, and something hit him in the face. Willis immediately turned the Corvette around and gave chase to find out the identity of the other driver. The Willis motorcade did the same.
Letulle, in his Toyota, was unable to outrun Willis in the Corvette. Willis caught up to Letulle, ordered him to stop, and he did. Willis got out of his vehicle, went to Letulle’s vehicle, and a verbal encounter ensued. Letulle then put his vehicle in gear and drove off. Willis again gave chase. Willis ultimately passed Letulle, pulled in front of his vehicle, and stopped. Letulle also stopped, then backed up and took a right on Brittany Road. Willis again gave chase. Letulle drove down the middle of the road. Willis tried to pass Letulle, the two vehicles collided, and both vehicles went off of the road and were wrecked.
Shortly after this, the Willis motorcade arrived at the scene. At 8:19 a.m., Deputy Robert Weber of the Ascension Parish Sheriffs Office arrived at the scene and investigated the accident. The accident occurred in the vicinity of 9198 Brittany Road on the outskirts of the Town of Sorrento. Willis was admitted to the Riverview Medical Center in Gonzales, Louisiana, later on October 9th.
ADMISSIBILITY IN A CIVIL PROCEEDING OF EVIDENCE OF THE DETAILS OF A CRIME FOR WHICH A WITNESS WAS CONVICTED
(Assignment of error 3)
Willis contends the trial court erred by allowing counsel for the defendants to examine him about the details of his prior conviction for conspiracy, citing La.C.E. art. 609. Letulle, Cumis and Allstate respond by asserting (1) the details were furnished, in part, by a nonresponsive answer of Willis, (2) some of the questions involved the details of the sentence and not those of the crime, and (3) some of the details had independent relevance to show inconsistent statements concerning Willis’ loss of wages claim. In particular, it is contended that Willis introduced tax returns showing an increase in income from $22,000 in 1983 to $80,000 in 1988, that Willis claimed that this “disability caused by his injury would affect his ability to earn this income in the future”, and that “it was necessary to show that the plaintiff had participated in unloading 15,872 tons of marijuana for which he received either $20,000 or $60,000” ... “to show the extent to which the plaintiff had misled the jury in his testimony.”
The facts concerning this assignment of error are found in the record as follows. During cross-examination of Willis by counsel for the Union, the following occurred:
Q DURING THE PERIOD OF TIME WHILE YOU WERE EMPLOYED BY RESERVE BARGE, OR AS A RESULT OF YOUR EMPLOYMENT WITH RESERVE BARGE, DID YOU COME ABOUT TO BE CONVICTED OF A CRIME?
A YES, SIR, I DID.
Q WHAT CRIME WAS THAT?
A CONSPIRACY.
Q CONSPIRACY TO DO WHAT?
MR. MARCELLO: I WANT TO OBJECT, YOUR HONOR, UNDER ARTICLE 609, TO THIS ENTIRE LINE OF QUESTIONING. I THINK YOUR HONOR IS ALREADY APPRISED OF THE BASIS OF MY OBJECTION. MR. ROBEIN DOES NOT HAVE SUFFICIENT EVIDENCE IN ORDER TO TALK ABOUT THIS AND YET HE’S TRYING TO GET INTO IT WITH MY CLIENT.
MR. ROBEIN: IF I COULD, I WILL.
*1051 THE COURT: YOUR OBJECTION IS OVERRULED, MR. MARCELLO.
BY MR. ROBEIN:
Q IS IT A FEDERAL CONSPIRACY CHARGE?
A YES, SIR.
Q WERE YOU TRIED?
A YES, SIR.
Q IN WHAT COURT?
A FEDERAL COURT IN NEW ORLEANS.
MR. MARCELLO: I WANT TO OBJECT, YOUR HONOR. WE’RE GETTING INTO THE DETAILS.
MR. ROBEIN: THAT’S NOT THE DETAILS OF THE CRIME.
THE COURT: OBJECTION IS OVERRULED.
BY MR. ROBEIN:
Q WERE YOU SENTENCED?
A YES, SIR.
Q TO WHAT?
A FEDERAL PRISON, FORT WORTH, TEXAS, FOR SIX MONTHS. I SERVED FOUR MONTHS AND SEVENTEEN DAYS.
Q AS PART OF THAT SENTENCE, WERE YOU ON PROBATION?
A YES, SIR, FOUR YEARS AND SIX MONTHS.
Q SO, THE TOTAL OF TIME SERVED—
A FIVE YEARS.
Q THAT WAS THE TOTAL SENTENCE, FIVE YEARS AND — WHAT? —SIX MONTHS OR LESS WOULD BE IN JAIL AND THE REST WOULD BE ON PROBATION?
A YES, SIR.
Q ARE YOU ON PROBATION TODAY?
A NO, SIR, I BEEN OFF PROBATION FOR THREE YEARS.
Q AND TO GO BACK TO THE NAME OF THE CRIME, IT WAS CONSPIRACY TO DO WHAT?
A SIR, I DON’T REALLY KNOW. ALL I KNOW IS, I WENT TO FEDERAL COURT, I LISTENED TO WHAT EVERYBODY SAID, TOLD THEM TO GIVE ME MY TIME AND LET ME GET OUT THE DOOR, AND IT WAS OVER.
Q WAS IT CONSPIRACY TO DISTRIBUTE MARIJUANA?
A NO, THEY COULDN’T GET ME FOR — I THINK IT WAS IMPORTING SOMETHING. IT WAS SUPPOSED TO BEEN — YOU SEE, THERE WAS A DEAL CUT. I REALLY DON’T KNOW.
Q WAS IT CONSPIRACY TO DISTRIBUTE WHAT THE FEDS CALL A CONTROLLED SUBSTANCE?
A NO, SIR. LISTEN, YOU LET ME FINISH NOW. THEY TOLD ME— THEY CONVICTED ME FOR GOING OUT IN THE GULF AND UNLOADING A SHIP ONTO BARGES. THAT’S WHAT I PLEADED GUILTY TO. I AIN’T NEVER BEEN IN THE GULF IN MY LIFE. UNDER OATH, I SWEAR. BUT I PLEADED GUILTY TO IT SO I COULD GET OUT OF THERE AND GET MY TIME OVER WITH AND LET ME GET ALL OF THAT OUT BEHIND ME AND FORGET ALL THAT. AND THAT’S WHAT I DONE. THE MAN GIVE ME — THE FEDERAL JUDGE POSTPONED EVERYTHING, SAID, “WAIT A MINUTE, SOMETHING’S GOING ON HERE I DON’T KNOW NOTHING ABOUT.”
Q WAS THE CASE TRIED?
A SAY THAT AGAIN, SIR.
Q WAS THE CASE TRIED? WAS THERE A TRIAL, LIKE TODAY?
A RIGHT, THERE WAS A JUDGE. NO JURY OR NOTHING LIKE THAT. JUST THE JUDGE AND THE FEDERAL PROSECUTORS AND ME.
Q I UNDERSTAND.
MR. MARCELLO: LET THE RECORD REFLECT I’M OBJECTING TO THIS WHOLE LINE OF QUESTIONING.
THE COURT: THAT’S UNDERSTOOD.
During cross-examination of Willis by counsel for Allstate, the following occurred:
*1052 BY MR. SMITH:
Q YOU TESTIFIED CONCERNING YOUR PERSONAL INCOME, TOO; DID YOU NOT?
A I TESTIFIED TO WHATEVER IT IS ON THEM INCOME TAX PAPERS.
Q OKAY. AND DID YOU PERSONALLY, OR YOUR COMPANY, HAVE ANY SOURCES OF INCOME FROM SOME OTHER ACTIVITIES THAT YOU’VE BEEN INVOLVED IN, THAT YOU DID NOT REPORT, SUCH AS THAT BUSINESS WITH RESERVE BARGE?
A SAY THAT AGAIN?
Q DID YOU HAVE SOME OTHER INCOME, WERE YOU PAID FOR DOING SOME OTHER THINGS? FOR INSTANCE, WHEN YOU WERE WITH RESERVE BARGE, YOU DID NOT REPORT ON YOUR INCOME—
A I DON’T KNOW WHAT YOU’RE TALKING ABOUT.
MR. MARCELLO: I WANT TO OBJECT. WHAT COUNSEL IS REFERRING TO NOW OCCURRED PRIOR TO THESE TAX RETURNS. I THINK HE’S A LITTLE BIT TROUBLED-PERPLEXED BY WHAT— BY THE TIMING ON THESE THINGS. AND I THINK THE QUESTIONS ARE HIGHLY PREJUDICIAL AND SUGGESTIVE OF THE FACT THAT HE DID NOT REPORT INCOME WHEN, IN TRUTH AND IN FACT, HE DID.
MR. SMITH: I’LL JUST ASK HIM IN GENERAL, THEN, IF IT’S ALL RIGHT WITH THE COURT.
BY MR. SMITH:
Q DID YOU RECEIVE INCOME FROM ANY ACTIVITIES, THAT YOU DID NOT REPORT ON YOUR INCOME TAX RETURNS?
MR. MARCELLO: AT WHAT TIME?
BY MR. SMITH:
Q AT ANYTIME.
A ANYTIME IN MY LIFE?
Q YES.
A YES, SIR, I PROBABLY HAVE.
Q MORE SPECIFICALLY, IN CONNECTION WITH THIS BUSINESS AT RESERVE BARGE, DID YOU FAIL TO REPORT WHAT YOU WERE PAID TO DO THERE?
MR. MARCELLO: I’M GOING TO OBJECT, YOUR HONOR. I THINK HE’S GETTING INTO DETAILS THAT ARE PROHIBITED BY ARTICLE 609, SPECIFICALLY PROHIBITED.
MR. SMITH: I’M NOT OFFERING ANY EVIDENCE IN ORDER TO IMPEACH THE WITNESS’ CREDIBILITY, AS ARTICLE 609 PROVIDES. I AM OFFERING EVIDENCE TO EXPLAIN CONCEPTIONS THE JURY MAY HAVE ABOUT THE MAN’S INCOME. HE HAS TESTIFIED AS TO CERTAIN INCOME.
THE COURT: PROCEED.
MR. MARCELLO: I WANT TO OBJECT, YOUR HONOR. HE’S TRYING TO DO INDIRECTLY—
THE COURT: YOU OBJECTED, AND I HAVE OVERRULED.
MR. MARCELLO: FOR THE RECORD, YOUR HONOR, HE’S TRYING TO—
THE COURT: I HAVE OVERRULED YOU, MR. MARCELLO. YOU HAVE MADE YOUR POINT. SIT DOWN.
MR. MARCELLO: I WANT TO STATE FOR THE RECORD, MY OBJECTION, YOUR HONOR.
THE COURT: YOU HAVE STATED YOUR OBJECTION.
BY MR. SMITH:
Q MORE SPECIFICALLY, SIR, WHILE YOU WERE ENGAGED IN THAT BIT OF BUSINESS THAT YOU TESTIFIED ABOUT, WITH REGARD TO UNLOADING SOME THINGS IN THE GULF OF MEXICO, YOU WERE PAID FOR THAT, WEREN’T YOU?
A • YES, SIR.
Q YOU DIDN’T REPORT THAT ON YOUR INCOME TAX, DID YOU?
A NO, SIR.
Q HOW MUCH WERE YOU PAID?
A TWENTY THOUSAND DOLLARS.
*1053 Q WHAT DID YOU DO TO GET THAT TWENTY THOUSAND?
A I SIT IN MY OFFICE.
Q WHAT DID YOU UNLOAD, SIR?
A I DIDN’T UNLOAD NOTHING.
Q I DIRECT YOUR ATTENTION TO YOUR DEPOSITION, PAGE 8, LINE 16. YOU WERE ASKED, “WHAT DO YOU MEAN, A LITTLE PROBLEM WITH SOME DOPE?” AND YOUR ANSWER, “UH-HUH, I UNLOADED 15,872 TONS OF MARIJUANA.” DID YOU GIVE THAT TESTIMONY?
A YES, SIR, I SURE DID. I MYSELF—
Q WAS IT THE TRUTH THEN?
MR. MARCELLO: WAIT. HE HAS TO BE ABLE TO ANSWER THE QUESTION. YOU’RE BUTTING IN ON HIM.
MR. SMITH: HE ANSWERED IT.
THE COURT: WELL, HE INTERRUPTED THE QUESTION, MR. MARCELLO.
MR. MARCELLO: HE WAS NOT FINISHED ANSWERING THE FIRST QUESTION.
THE COURT: SIT DOWN, MR. MARCELLO. FINISH YOUR QUESTION, SIR.
BY MR. SMITH:
Q DID YOU GIVE THAT ANSWER AT YOUR DEPOSITION, MR. WILLIS? —YES OR NO.
MR. MARCELLO: I MOVE FOR A MISTRIAL, YOUR HONOR. THIS TESTIMONY IS OBVIOUSLY RIDICULOUSLY INFLAMMATORY AND PREJUDICIAL. I MOVE FOR A MISTRIAL AT THIS TIME. AND COUNSEL KNEW IT WOULD CAUSE A MISTRIAL.
THE COURT: YOUR MOTION IS OVERRULED.
BY MR. SMITH:
Q DID YOU GIVE THAT ANSWER AT YOUR DEPOSITION, SIR? — YES OR NO.
A ASK ME THE QUESTION.
Q DID YOU TELL ME, AT YOUR DEPOSITION, THAT YOU UNLOADED 15,872 TONS OF MARIJUANA?
A NOT ME MYSELF, NO.
Q THE TESTIMONY OF THE EFFECT, “I UNLOADED 15,872 TONS OF MARIJUANA ...”—
A SIR, THAT WAS A FIGURE OF SPEECH.
Q AND FOR THAT FIGURE OF SPEECH, YOU WERE PAID $20,000?
A NO, SIR, NOT FOR THAT FIGURE OF SPEECH, I WAS PAID $20,-000. NO, SIR.
Q YOU RECEIVED $20,000?
A NO SIR. I RECEIVED $20,000 BECAUSE THE FEDERAL PEOPLE WAS AFTER THE MAN, AND HE COME UP'THERE AND PUT TWENTY THOUSAND — HE PUT $60,000 IN MY CAR. HE DIDN’T HAND IT TO ME. I AIN’T NEVER SEEN A SPECK OF MARIJUANA IN MY LIFE. ASK ME IF I EVER SEEN MARIJUANA COME OUT OF THEM BARGES.
Q I’LL ASK YOU THIS: HOW MANY TIMES DID YOU UNLOAD THOSE BARGES?
A FIFTEEN TIMES. MY PEOPLE. YOU KEEP SAYING “I.” MY PEOPLE. I AIN’T NEVER GOT OUT THE OFFICE.
Q I DIRECT YOUR ATTENTION TO YOUR DEPOSITION, PAGE 10, WHERE IT—
A YES, WELL, I’M SPEAKING FROM MY WHOLE — WHEN YOU ALL ASKED ME THESE QUESTIONS, I’M TALKING ABOUT — I’M IN CHARGE, YOU KNOW, MY PEOPLE DONE IT. I AIN’T NEVER GOT ON A CRANE AND OPERATED A CRANE OR UNLOADED ALL THAT STUFF.
Q I DIRECT YOUR ATTENTION TO YOUR DEPOSITION, PAGE 10, LINE 18, WHERE YOU WERE ASKED THE SAME QUESTION, AND YOUR RESPONSE WAS, “THEN I WENT IN BUSINESS FOR MYSELF, AND THEN THEY COME DOWN AND SEEN ME ABOUT UNLOADING IT FOR THEM. THEY SAID THEY WAS GOING TO *1054 PAY ME SO MUCH MONEY AND ALL THAT. AND, YES, I’LL TAKE IT. AND WE UNLOADED IT EIGHT MORE TIMES. IT WAS FIFTEEN TIMES TOTAL, I THINK. AND I GOT PAID FOR IT AND EVERYTHING.
A TWENTY THOUSAND DOLLARS, RIGHT. YOU SEE YOU’RE JAMMING EVERYTHING TOGETHER AT ONE TIME. NOW YOU’RE TALKING ABOUT TWO YEARS’ PERIOD ON THE FIFTEEN TIMES.
La.C.E. art. 609(A) pertains to attacking credibility by evidence of conviction of a crime in civil[1] cases and provides as follows:
General Civil Rule. For the purpose of attacking the credibility of a witness in civil cases, no evidence of the details of the crime of which he was convicted is admissible. However, evidence of the name of the crime of which he was convicted and the date of conviction is admissible if the crime:
(1) Was punishable by death or imprisonment in excess of six months under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party; or
(2) Involved dishonesty or false statement, regardless of the punishment.
La.C.E. art. 609(A) only provides for the admissibility of evidence of (1) “the name of the crime” and (2) “the date of conviction”. Despite this, the trial court admitted evidence over objection pertaining to (1) the sentence imposed,[2] (2) the amount of money Willis was paid ($20,000) for committing the crime, (3) the number of times (15) Willis participated in unloading barges of marijuana, and (4) the tonnage unloaded (15,872 tons). Even if it is assumed for the purpose of argument that the money Willis received for unloading marijuana ($20,000) is marginally relevant to the issues of credibility and loss of wages[3] (as asserted by the appellees), the admission of the testimony pertaining to the number of unloading operations (15) and the tonnage unloaded (15,872 tons) was improperly admitted into evidence, constituted prejudicial error and interdicted the jury’s verdict.
This error was accentuated and became highly prejudicial when counsel for Allstate utilized this evidence to argue that Willis was negligent in his closing argument to the jury. At pages 616 to 619 of the transcript appears the following:
MR. WILLIS HAS LIVED A LIFE AND DESCRIBED A LIFE TO YOU THAT WILL SHOW THAT HE HAS ALWAYS BEEN ON THIS OUTER EDGE OF REASONABLENESS. WE ARE ALL DIFFERENT. SOME OF US ARE VERY CONSERVATIVE AND QUIET AND DON’T TAKE CHANCES. OTHER PEOPLE LIVE ON THE BUBBLE, MORE OR LESS. THEY’RE ALWAYS READY TO POP OFF INTO AN AREA OF UNREASONABLENESS. MR. WILLIS HAS TOLD YOU HE GREW UP IN A PLACE WHERE HE HAD TO FIGHT TO SURVIVE. HE HAS WORKED ON THE RIVER, AND HE *1055 DESCRIBED IT AS A VIOLENT PLACE.
LOOK AT MR. SANDOLPH, THAT BIG FINE MUSCULAR MAN WHO SAT RIGHT THERE AND TESTIFIED —SAID, “IT’S NOT A BAD PLACE, IT’S JUST LIKE ANYWHERE ELSE. IT’S A REASONABLY GOOD PLACE TO WORK.” LIFE IS WHAT YOU MAKE IT. IF YOU MAKE IT A PLACE OF FISTFIGHTS, THAT’S WHAT YOU’RE GOING TO LIVE WITH. IF YOU HAVE THAT GENTLE DISPOSITION THAT THAT MAN HAD, IF YOU MAKE A LIFE THAT IS A GENTLE AND PLEASANT LIFE, THAT’S WHAT YOU’RE GOING TO HAVE. MR. WILLIS LIVED ON THE BUBBLE AND HE CHOSE TO MAKE IT A VIOLENT LIFE.
HE GOT INVOLVED IN ALL SORTS OF THINGS. YOU KNOW SOME OF THE THINGS. YOU KNOW, FROM HIS OWN TESTIMONY, THAT HE BROUGHT INTO THIS COUNTRY 15,-872 TONS OF MARIJUANA. HE SAID HE GOT $20,000 FOR IT. HE ALSO WENT TO JAIL FOR IT. I’M NOT MUCH OF A PHYSICIST, BUT I KNOW THAT 15,872 TONS OF MARIJUANA IS 31,744,000 POUNDS. WITH FIVE MILLION PEOPLE IN THE STATE OF LOUISIANA, THAT IS SIX POUNDS OF MARIJUANA FOR EVERY MAN, WOMAN, AND CHILD IN THIS STATE. I OFFER THAT, NOT TO SHOW THAT HE IS A TERRIBLE, HORRIBLE MAN, BUT TO SHOW YOU THAT THE TYPE OF LIFESTYLE HE HAS CHOSEN FULLY SATISFIES ME THAT WHAT HE DID WHEN HE CHASED THAT BOY IS WHAT YOU WOULD EXPECT HIM TO DO. I MEAN, THAT IS JUST AUTOMATIC. YOU KNOW HE IS GOING TO DO THAT. IT IS UNREASONABLE BUT IT IS THE KIND OF LIFESTYLE HE HAS AND IT’S THE KIND OF PERSONALITY HE HAS. THAT IS HIS MAKEUP.
I’M NOT GOING TO GO OVER THE FACTS OF THE CASE TOO MUCH WITH YOU BECAUSE YOU KNOW WHAT HE SAID. HE CHASED THE MAN DOWN ONCE, HE CHASED HIM DOWN TWICE, AND HE CHASED HIM DOWN TO THE ACCIDENT THE THIRD TIME. HE ADMITS IN HIS DEPOSITION HE WANTED TO BEAT HIS BRAINS OUT. HE TRIES TO TELL YOU ON THE WITNESS STAND THAT HE SIMPLY WANTED TO SEE WHO WAS THIS DOING THIS TO ME BECAUSE HE DIDN’T KNOW THE MAN. HE HAD TWO GOOD LOOKS. HE PASSED HIM AND STOPPED ONE TIME AND SAW HIM; HE PASSED HIM AND STOPPED HIM A SECOND TIME HE SAW HIM. HE HAD PLENTY OF GOOD LOOKS. HE WANTED MORE THAN TO FIND OUT WHAT THIS MAN LOOKED LIKE THAT WAS DOING THIS TO HIM. HE BECAME THE AGGRESSOR AT SOME POINT. I CAN SEE POSSIBLY IF SOMEBODY THROWS AN EGG AT ME, AND I’M MAD ABOUT SOMETHING. I’LL CHASE HIM DOWN AND FIND OUT— I’LL GO SO FAR. I’LL FOLLOW HIM TO SEE IF I CAN GET THE LICENSE PLATE OR RECOGNIZE WHOSE HOUSE THEY GO INTO, WHAT PART OF TOWN THEY’RE COMING FROM. I WOULD DO THINGS LIKE THAT. I THINK ANY OF US WOULD DO SOMETHING LIKE THAT. BUT I WOULDN’T PURSUE IT THIS FAR. AND I WOULD SUGGEST TO YOU THAT PURSUING THIS BOY LIKE THIS, HE ACTED UNREASONABLY. UNREASONABLENESS IS NEGLIGENCE.
This assignment of error has merit.
DIRECTED VERDICT IN FAVOR OF THE UNION
(Assignment of error 2)
Willis contends the trial court committed error by granting a directed verdict in favor of the Union.
In his pleadings, Willis alleged that the Union was liable for the actions of Letulle. The liability of a labor union for acts of its officers or members is controlled *1056 by 29 U.S.C.A. § 106 which provides as follows:
No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof (Emphasis added)
See also La.R.S. 23:842.[4] What constitutes “actual participation”, “actual authorization” or “ratification” depends on the particular facts and circumstances of each case. See, for example, United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639, 883 F.2d 132, reversed in part on other grounds on rehearing en banc, 913 F.2d 948 (D.C.Cir.1990); Charles D. Bonanno Linen Service, Inc. v. McCarthy, 708 F.2d 1 (1st Cir.), cert. denied, 464 U.S. 936, 104 S.Ct. 346, 78 L.Ed.2d 312 (1983); Melancon v. United Association of Journeymen, 386 So.2d 669 (La.App. 1st Cir.), writ denied, 387 So.2d 596 (La.1980). The “clear proof” required by this statute is the same as “clear and convincing” evidence under Louisiana law. Coates v. Local 270 of International Brotherhood of Teamsters, Chauffeurs, and Warehousemen of America, 449 So.2d 662 (La.App. 4th Cir.), writ denied, 450 So.2d 968 (La.1984). Proof by clear and convincing evidence requires more than “a preponderance of the evidence”, the traditional measure of persuasion, but less than “beyond a reasonable doubt”, the stringent criminal standard. Succession of Bartie, 472 So.2d 578 (La.1985); Hines v. Williams, 567 So.2d 1139 (La.App. 2d Cir.), writ denied, 571 So.2d 653 (La.1990). Proof by a preponderance requires that the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Hines v. Williams, 567 So.2d at 1141.
However, the issue of the Union’s liability is not before us on its merits; it is before us for review of a ruling on a motion for a directed verdict. Directed verdicts in jury trials are provided for in La.C. C.P. art. 1810.[5] A motion for a directed verdict should be granted only if the facts and inferences are so overwhelmingly in favor of the moving party that the court finds that reasonable men could not arrive at a contrary verdict. State ex rel. Guste v. Nicholls College Foundation, 564 So.2d 682 (La.1990). The proper methodology for making this determination is discussed in Patin v. Dow Chemical Co., 546 So.2d 1277, 1278-1279 (La.App. 1st Cir.), writs denied, 551 So.2d 1338, 551 So.2d 1339 (La.1989) as follows: *1057 Rules of Civil Procedure, the correct standard to apply in considering such a motion is the federal jurisprudential one, delineated in Boeing Company v. Shipman, 411 F.2d 365 (5th Cir.1969):
*1056 We have agreed previously with our brethren in the Third Circuit that as the source of our article 1810 is the Federal
*1057 On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence — not just that evidence which supports the non-mover’s case— but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.
[[Image here]]
We have thoroughly reviewed plaintiffs’ evidence in the light most favorable to plaintiffs, and drawn all reasonable inferences most favorable to them, making no evaluations of credibility since these have no place in a decision on a motion for directed verdict. (Citation omitted)
The essence of this jurisprudence, as applied to the instant case, is that we must determine whether Willis has presented a prima facie[6] case of clear and convincing evidence that the Union actually participated in, actually authorized, or actually ratified (after knowledge thereof), the facts attributed to Letulle.[7]
A recapitulation of the testimony pertinent to this issue is essential to ruling on it. Letulle testified he was a member of the Union and participated in the strike as a picket. Prior to October 9, 1986, Letulle got an egg, punched holes in both ends of it, blew out the egg yolk, and filled the egg with paint. Letulle did this because he was concerned about vehicles that did not have “respect” for the picket line, and the paint-filled egg was designed to “mess up somebody’s paint job”. When Letulle saw the red Corvette, he knew it was Willis. During cross-examination by Willis’ counsel, Letulle was asked “Did your throwing the paint on Mr. Willis’ vehicle and at Mr. Willis have anything to do with him crossing the picket line?” and he responded “Yes”. Letulle testified that after he threw the egg at Willis’ vehicle, and Willis and the motorcade turned around and chased him, his purpose in driving away was to escape them. He drove down the middle of Brittany Road to keep Willis from passing him, and, when Willis tried to pass him, the Willis vehicle ran into him, and both vehicles wrecked. He did not run Willis off of the road. Letulle testified he never threatened Willis prior to the accident and denied that any Union official told him he would be protected if he did anything to Willis.
Willis testified that prior to October 9, 1986, when he crossed the picket line, the picketers “threatened me, called me all kinds of names, busted my windshield out of my truck, just anything you could do to anybody to harass them, you know; threatened my life, said things about my family.” Willis chased Letulle because he “wanted to know who he was and why he wanted to hurt me.” Willis chased Letulle down Brittany Road, and, when he tried to pass him, Letulle “whooped over right in front of me and just takes the whole fender off the *1058 car.” Willis testified that after the accident, the following occurred:
AND AFTER HE GOT OUT, WE GOT TO TALKING. I SAID, “MAN, YOU DON’T KNOW ME.” I SAID, “DO YOU KNOW WHO I AM?” AND HE SAID, “YEAH, I KNOW WHO YOU ARE.” AND I SAID, “WELL, WHO AM IT [sic]?” AND HE SAID, “YOU’RE DONALD WILLIS.” AND I SAID, “YEAH, AND YOU’RE A GODDAMN LONGSHOREMAN, AIN’T YOU?” AND HE SAID YEAH, HE WAS. WE STOOD THERE FOR A MINUTE. AND I SAID, “AIN’T YOU PROUD OF WHAT WE GOT HERE? MY CAR TORE ALL TO HELL, YOUR CAR TORE ALL TO HELL.” I SAID, “AIN’T YOU PROUD OF THIS, EVERYTHING TORE ALL TO PIECES?” AND HE SAID, “I AIN’T WORRIED ABOUT IT, THE UNION TOLD ME ANYTHING I DONE TO YOU, THEY’D GET ME OUT OF.” I SAID, “WELL, BABE, LET’S SEE THE UNION GET YOU OUT OF THIS.”
Albert Mixon was in the Willis motorcade and gave the following testimony about what happened after the accident:
THEN I WENT OVER AND LOOKED AT HIM, ASKED HIM IF HE WAS OKAY. I HELPED THE GUY OUT OF THE CAR. HE WAS ALL SHOOK UP, YOU KNOW, LIKE IF I WAS GOING TO JUMP ON HIM. BUT I TOLD HIM, “MAN, DON’T WORRY, I’M JUST COMING TO SEE IF YOU [sic] ALL RIGHT.” AND HE GOT OUT, AND THEN DONALD WALKED OVER AND ASKED THE GUY, “WHO ARE YOU? WHY DID YOU THROW SOMETHING AT ME?” AND THE GUY JUST LOOKED AT HIM. HE SAID, “DO YOU KNOW ME?” AND HE SAID, YEAH, HE DID. AND HE SAID, “WELL, WHO AM I?” AND THE GUY SAID, “YOU WILLIS, YOU DONALD WILLIS.” AND DONALD SAID, “WELL, YOU A LONGSHOREMAN, AREN’T YOU?” AND HE SAID YEAH. HE SAID, “WHY YOU TRYING TO CAUSE HARM TO ME? I NEVER DONE [sic] YOU ANYTHING.” AND THIS GUY SAID, “WELL, THEY TOLD ME ANYTHING I’D DO, THEY’LL BACK ME UP.”
Q WHO DID HE SAY “THEY” WAS?
A THE LONGSHOREMEN.
Q ARE YOU TALKING ABOUT THE UNION?
A RIGHT.
[[Image here]]
BY MR. ROBEIN:
Q NOW, YOU TOLD MR. MARCEL-LO, OR ACTUALLY HE TOLD YOU AND YOU SAID YEAH, THAT MR. LE-TULLE SAID THAT THE UNION WAS GOING TO GET HIM OUT OF TROUBLE.
A YES, SIR.
Q BUT WHEN YOU ANSWERED HIS QUESTION THE FIRST TIME, YOU SAID, “THEY TOLD ME, ANYTHING I WOULD DO, THEY WOULD BACK ME UP.”
A YEAH.
Q IS THAT WHAT HE SAID?
A IS THAT WHAT THE GUY OVER HERE SAID? I’M USING, YOU KNOW, IN MY WORDS. THE GUY SPECIFICALLY SAID, “THE UNION TOLD ME ANYTHING I DO, THEY’LL BACK ME UP.” I WAS JUST PUTTING IT IN MY WORDS.
Q THAT WASN’T THE QUESTION. I WANT TO KNOW THE WORDS THAT CAME FORTH FROM THAT GENTLEMAN’S MOUTH. YOU CAME UP TO THE CAR. WHAT WERE THE FIRST WORDS THAT HE SAID?
A WHEN I PULLED HIM OUT OF THE CAR? THAT’S WHAT I’M SAYING, HE ASKED HIM WHY HE TRIED TO HURT HIM.
Q MR. WILLIS?
A YEAH, MR. WILLIS ASKED HIM WHY DID HE TRY TO, YOU KNOW, HURT HIM, THAT HE NEVER DONE [sic] HIM ANYTHING. AND DONALD ASKED HIM DID HE KNOW HIM, SO FORTH. AND DONALD SAID, “WELL, YOU’RE A LONGSHOREMAN, AREN’T YOU?” AND HE SAID *1059 YEAH. AND HE SAID, “WHY YOU TRYING TO HURT ME?” AND THE GUY SAID, “WELL, THE UNION TOLD ME, ANYTHING I DO, THEY’LL BACK ME UP.” THAT WAS STRAIGHT OUT, JUST LIKE THAT.
Q IS THAT EVERYTHING?
A THAT’S IT.
Q DID THE WORD LONGSHOREMAN COME INTO IT?
A I DO NOT REMEMBER.
Q AND THOSE WERE THE ONLY WORDS YOU HEARD?
A YES, SIR, AS FAR AS THE BEST OF MY KNOWLEDGE.
John Sandolph was also a member of the Willis motorcade and gave the following testimony about what happened after the accident:
Q DID YOU EVENTUALLY GET ON THE BRITTANY ROAD TO GO TO THE SCENE OF THE ACCIDENT?
A YES, I DID.
Q DID YOU ACTUALLY SEE THE ACCIDENT HAPPEN?
A NOT REALLY SEE THE ACCIDENT HAPPEN.
Q WERE ALL OF THE VEHICLES AT REST WHEN YOU ARRIVED?
A YES, SIR.
Q TELL US WHAT HAPPENED AFTER YOU ARRIVED.
A WE WENT OVER TO DONALD AND ASKED HIM WAS HE ALL RIGHT. HE WAS OKAY. AND THEN WE WENT OVER WE GOT THE OTHER GUY OUT THE CAR. DONALD CAME OVER AND ASKED HIM, “DO YOU KNOW ME?” HE HUNG HIS HEAD DOWN, AND THEN AFTER A WHILE HE SAID, “YEAH, YOU’RE DONALD WILLIS.”
AFTER THAT HE ASKED HIM AGAIN, “WELL, WHAT IS THIS SUPPOSED TO BE?” AND HE JUST TOLD HIM HE WAS GOING TO JAIL, THAT WAS IT. FROM THEN HE SAID, “THEY TOLD ME WHATEVER I DO, THEY’LL STAND BEHIND ME.”
Q DID HE SAY WHO “THEY” WAS?
A YEAH, HE DID.
Q WHAT DID HE SAY?
A HE SAID THE UNION WOULD STAND BEHIND HIM.
Leroy Himel, the business agent for the Union at the time of the strike, gave the following testimony:
Q DO YOU KNOW WHETHER OR NOT YOUR UNION APPROVED OF WHAT MR. LETULLE HAD DONE DURING THE COURSE OF THE ACCIDENT?
A THE UNION DOES NOT APPROVE OF ANY VIOLENCE FROM ANYONE, ANY SIDE.
Q LET ME ASK YOU ANOTHER QUESTION. IF THE UNION DOES NOT APPROVE OF ANY VIOLENCE, WAS THE UNION AWARE AT THAT TIME THAT THERE WAS ANY VIOLENCE BEING PERPETRATED BY UNION MEMBERS?
A I DON’T BELIEVE THE UNION WAS AWARE OF ANY VIOLENCE PERPETRATED BY ANY UNION MEMBER. I’M POSITIVE ABOUT THAT.
After reviewing the pertinent testimony in the light most favorable to Willis and making no credibility determinations, we conclude that the trial court was legally wrong and manifestly erroneous factually in finding that Willis failed to present a prima facie case of clear and convincing evidence that the Union actually authorized Letulle’s conduct. Our review of the evidence indicates that it is of such a quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions. The motion should have been denied.
This assignment of error has merit.
REMAND
Because Louisiana appellate courts have jurisdiction over the facts in a civil case, a prejudicial error does not necessarily require a remand. La.Const. of 1974, art. V, § 10; La.C.C.P. art. 2164. Ordinarily, trial court (jury) findings of fact are reviewed on appeal under the manifest *1060 error (clearly wrong) standard. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where one or more trial court legal errors interdict the trial court’s (jury’s) fact-finding process, the manifest error (clearly wrong) standard is no longer applicable, and, if the record is otherwise complete, the appellate court can make its own independent (de novo) review of the record and determine a preponderance of the evidence. McLean v. Hunter, 495 So.2d 1298 (La.1986); Picou v. Ferrara, 483 So.2d 915 (La.1986); Suhor v. Gusse, 388 So.2d 755 (La.1980) and the cases cited therein. However, where the weight of the evidence is nearly equal and a firsthand view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial. Ragas v. Argonaut Southwest Insurance Co., 388 So.2d 707 (La.1980); Savin v. Allstate Insurance Company, 579 So.2d 453 (La.App. 1st Cir.1991) (decided March 28, 1991, under docket number 90-CA-0079).
Because the Union was erroneously granted a motion for a directed verdict, it will be necessary to remand this case to the trial court for a new jury trial on the case between Willis and the Union. Patin v. Dow Chemical Co., 546 So.2d at 1279.
Insofar as Letulle, Allstate and Cumis are concerned, the record herein is complete. However, the weight of the evidence is nearly equal, and a firsthand view of the appearance and demeanor of the witness is essential to fairly resolve the crucial credibility issues herein. These serious questions of credibility caused by the conflicting testimony convinces us that a remand for a new trial for all parties would best serve the interests of justice. La.C. C.P. art. 2164; Landry v. Doe, 582 So.2d 242 (La.App. 1st Cir.1991).
DECREE
For the foregoing reasons, the judgments of the trial court (1) granting a directed verdict in favor of the Union and (2) in favor of Letulle, Allstate and Cumis dismissing Willis’ claims on the merits are reversed, and this case is remanded to the trial court for a new trial by jury. The costs of this appeal shall be assessed in a judgment on the merits after the new trial is concluded.
REVERSED AND REMANDED.

.Compare La.C.E. art. 609.1(C) which pertains to attacking credibility by evidence of conviction of crime in criminal cases and provides as follows:
Details of convictions. Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible. However, details of the offense may become admissible to show the true nature of the offense:
(1) When the witness has denied the conviction or denied recollection thereof;
(2) When the witness has testified to exculpatory facts or circumstances surrounding the conviction; or
(3)When the probative value thereof outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury.

. Facts pertaining to the sentence imposed are admissible in criminal cases pursuant to La.C.E. art. 609.1; they are not provided for in La.C.E. art. 609 in civil cases.

. Willis introduced several of his income tax returns on the issue of loss of income. He admitted he did not include the $20,000 on these returns, and, thus, this evidence showed less income than that actually earned. Query: How was Willis’ loss of income claim against the appellees affected when he claimed less income than he actually made?

. La.R.S. 23:842 provides as follows:
No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, as these terms are herein defined, shall be held responsible or liable in any civil action, or in any criminal prosecution, for the unlawful acts of individual officers, members, or agents, except upon proof by the weight of evidence and without the aid of any presumptions of law or fact, of the doing of such acts by persons who are officers, members or agents of any such association or organization and the ratification of such acts after actual knowledge thereof, by such association and organization.

. La.C.C.P. art. 1810 provides as follows:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

. Prima facie evidence is evidence sufficient to establish a given fact, which, if not rebutted or contradicted, will remain sufficient. Gulf Wide Towing, Inc. v. F.E. Wright (U.K.) Limited, 554 So.2d 1347 (La.App. 1st Cir.1989).

. Compare Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986) with Breithaupt v. Sellers, 390 So.2d 870 (La.1980). This standard of proof is substantially the same as that used in the review of the sufficiency of the evidence in criminal cases (except for the burden of proof). La.C.Cr.P. art. 821. In Reilly v. Dynamic Exploration, Inc., 571 So.2d 140, 144 (La.1990) the court observed that "The standard for granting a directed verdict mirrors the standard for granting a summary judgment."