CULPEPPER, Judge.
This is an action to annul a testament on the grounds of the subsequent birth of an illegitimate child to the testator. At issue is the constitutionality of LSA-C.C. art. 1705 which provides that a testament is revoked by the subsequent birth of a legitimate child to the testator but by the birth of an illegitimate child only under certain conditions. The trial court held the article constitutional. Plaintiff appeals.
FACTS
Mr. James Merkel Stuckey, the testator, was married but once and then to Katherine Means Stuckey. They had no children and were divorced. However, he left a portion of his estate to his former wife in an olographic will dated June 18, 1967. Mr. Stuckey lived with Kathleen Talley after his divorce, but they were never married, and the relationship eventually ended. He died on August 12, _ 1985.
Mr. Stuckey had one child by Kathleen Talley, Garett Talley, born on November 11, 1984. After the death of Mr. Stuckey on August 12,1985, Kathleen filed a suit to have Mr. Stuckey recognized as the child’s father. The trial court ruled that Mr. Stuckey was the father. The Third Circuit Court of Appeal affirmed, 560 So.2d 111 (La.App. 3d Cir.1990) and a writ to the Supreme Court of Louisiana was denied on June 29, 1990. Talley v. Stuckey, 565 So.2d 458 (La.1990).
Pursuant to a petition by Estelle Rouley Barras, as executrix, the olographic will by Mr. Stuckey dated June 18, 1967 was probated. Kathleen Talley, as natural tutrix for Garett Talley, then brought this action to annul the probated testament on the grounds that under LSA-C.C. art. 1705, it was revoked by the subsequent birth of the testator’s illegitimate child. Kathleen’s contention in the district court and on appeal is that since art. 1705 provides that a testament is revoked by the subsequent birth of a legitimate child to the testator but does not provide revocation by the subsequent birth of an illegitimate child, except on certain conditions, the article violates both the United States and the Louisiana Constitutions.
LAW
LSA-C.C. art. 1705 states:
“A testament is revoked by the subsequent birth of a legitimate child to the testator or by the subsequent adoption or legitimation of a child by the testator, unless the testator has made testamentary provision to the contrary or has made testamentary provision for such child.”
In a previous paternity suit, Garett Tally was held to be Stuckey’s child. The child was born in 1984, after Mr. Stuckey made his will in 1967. The child was not legitimate and Mr. Stuckey did not legitimate or adopt him or provide for him in his testament. Thus, applying the strict language of LSA-C.C. art. 1705, Mr. Stuckey’s testament was not revoked. However, Kathleen Talley asserts that LSA-C.C. art. 1705 violates constitutional equal protection.
Equal protection must be analyzed in the context of both the 14th Amendment of the United States Constitution and article 1 section 3 of the Louisiana Constitution. Article 1 section 3 of the Louisiana Constitution of 1974 states:
“... No law shall arbitrarily, capriciously or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations.” (emphasis supplied)
The pertinent language of the 14th Amendment, Section 1 of the United States Constitution provides:
“... nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.”
In Trimble v. Gordon, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), the court discusses three levels of equal protection analysis. The first is “strict scrutiny.” Strict scrutiny is applied to statutes involving a classification that is “suspect” be *1377 cause it discriminates against a politically powerless or unpopular minority or the classification impacts on a fundamental interest or right. The test for strict scrutiny is whether the classification is necessary to achieve a compelling governmental interest.
The least demanding analysis is the rational relationship test. If neither a suspect class nor a fundamental interest is involved, the court will analyze the situation with deference. The test is whether there is a rational relation between the statute and a legitimate state objective.
A middle level test was created in more recent years to analyze situations that involve gender, alienage and illegiti-mates. The test is that the classification must serve important governmental objectives and must be substantially related to the achievement of those objectives.
In Trimble v. Gordon, supra, the court considered an Illinois statute which allowed illegitimate children to inherit by intestate succession only from their mothers and not from their fathers. The Illinois Supreme Court had rejected an equal protection challenge on the basis of state interests in encouraging family relationships and establishing an accurate and efficient method of disposing of property at death. The United States Supreme Court reviewed its previous decisions holding that classifications based on illegitimacy are not “suspect,” as are racial classifications requiring strict scrutiny. The Court then adopted a middle level scrutiny requiring at a minimum that the statutory classification of illegitimates bear some rational relationship to a legitimate state purpose. Under this analysis, the Court held the statute unconstitutional, stating that a state may not attempt to influence the actions of men and women to improve family relationships by imposing sanctions on the innocent children born of illegitimate relationships, and that the difficulties of proving paternity do not justify total statutory disinheritance of illegitimate children of fathers who die intestate.
In Lalli v. Lalli, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) a New York statute required illegitimate children who would inherit from their fathers by intestate successions to obtain during the father’s lifetime a court judgment of filiation. The court, under the middle-level scrutiny, held the statute constitutional on the basis that it was substantially related to the legitimate state interest in providing orderly disposition of property at death. The court stated that whereas there is little difficulty in establishing maternity, proof of paternity is often difficult, and accuracy is enhanced by requiring adjudication during the father’s life. Trimble v. Gordon, supra, was distinguished on the basis that the Illinois statute considered there completely excluded illegitimate children from inheriting from their intestate fathers.
In Mills v. Habluetzel, 456 U.S. 91, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982) a Texas statute required that a paternity suit to identify the father of an illegitimate child for purposes of obtaining support must be brought before the child is one year old. No similar limitation was imposed on legitimate children. The court held the statute unconstitutional because one year after birth was not long enough. However, the court did recognize a legitimate state interest in protecting against stale or fraudulent claims by illegitimates. The court states:
Therefore, in support suits by illegitimate children more than in support suits by legitimate children, the State has an interest in preventing the prosecution of stale or fraudulent claims, and may impose greater restrictions on the former than it imposes on the latter. Such restrictions will survive equal protection scrutiny to the extent they are substantially related to a legitimate state interest.
In Mathews v. Lucas, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976) the Secretary of The Department of Health, Education and Welfare denied the decedent’s surviving illegitimate children benefits under the Social Security Act. The U.S. District Court of Rhode Island reversed the administrative decision. To be eligible for surviving child’s insurance benefits, illegitimate children had to show that the de *1378 ceased wage earner was claimant’s parent, and at the time of death was living with the child or contributing to his support. This statutory classification was challenged as unconstitutional.
The Supreme Court held these classifications permissible. The court refused to apply strict scrutiny to discrimination against illegitimates and found the classifications reasonably related to the likelihood of dependency at death. The court also found the classifications were consistent with a design to qualify entitlements of benefits upon a child’s dependency at the time of the parent’s death.
On the state level, the courts of appeal and the Louisiana Supreme Court have dealt with the issue of discrimination against illegitimates repeatedly. The early Louisiana Supreme Court case of Succession of Carbajal, 154 La. 1060, 98 So. 666 (1923) discussed the purposes of LSA-C.C. art. 1705. Succession of Carbajal was an action to annul the will of Nicholas Carba-jal, brought by the undercurator of an interdicted son, Oscar Carbajal, against his mother who was the curator. Oscar was one of six children alive at the death of the testator. The will was written two days before the death of the testator. A seventh child, Dolores, was born two months after the death of the testator. The testator knew his wife was pregnant. He donated to her his movable property with the usufruct of his immovables and declared his unborn child should share equally with the other children in the remainder of his estate.
The plaintiff alleged that the testament should fall under the strict terms of article 1705, which at the time read: “The testament falls by the birth of legitimate children.” This case addressed for the first time the effect of the subsequent birth of a legitimate child upon a will, when the child has been provided for in the testament.
It is also true, practically without exception, that the basic reason for the law as recognized in those forums is that it shall not be assumed a testator intended to exclude his unborn offspring from participation in his estate because of a will made before its birth. Thus, the sovereign, recognizing the frailties of the human mind and the uncertainty of life, seeks to compensate therefor by creating, in such circumstances, the same condition of equality which would otherwise exist if no testament had been made.
The Louisiana Supreme Court then adopted the view of other jurisdictions with similar provisions that since proper provision was made for the unborn then known to be conceived, “the condition contemplated by the article of the code for producing the nullity of the will had failed and its provisions were therefore inapplicable.” The court went on to discuss prior Louisiana cases setting forth the purposes of article 1705. Citing Lewis v. Hare, 8 La. Ann. 378 (1853), the court quoted:
“The reason of this provision is not given by the lawgivers, but is obvious. It is founded upon the reasonable presumption that the testator would not have given his property to others had he foreseen that he would afterwards have offspring. * * * There is no reason to suppose that a testator would have been insensible to the welfare of a posthumous child, if the contingency of its birth had suggested itself to his mind, any more than to suppose such insensibility in the case of a child born before his death. In both cases, it is reasonable to presume the testator would have felt the promptings of parental love, and the obligations of parental duty, if the event had been foreseen.”
In another Louisiana Supreme Court case, In the Matter of the Succession of Joseph L. Robins, 349 So.2d 276 (La.1977) the testator willed his estate, composed solely of separate property, to his two illegitimate sons. His widow opposed these legacies under LSA-C.C. art. 1488 (1870), which at that time prohibited natural parents from giving or willing any part of their estate to their illegitimate children, if they were conceived as a result of adultery or incest. The district court found the article to be in violation of Article 1, Section 3 of the Louisiana Constitution of 1974, in “that the code article unreasonably *1379 discriminates against adultery-conceived il-legitimates solely on the basis of their birth.” The court noted that the legislature may treat persons differently if there was “a rational basis for the differentiation which is reasonably related to a legitimate governmental purpose.”
In Succession of Joseph L. Robins, supra, the valid purpose said to be served was to help preserve the sanctity of the marriage by penalizing adulteries. The Louisiana Supreme Court found no rational basis for this discrimination against illegiti-mates solely because their birth resulted from an adultery and held LSA-C.C., art. 1488 unconstitutional. The court noted:
“Assuming that adulteries are a social evil that endanger the sanctity of marriages, we note that the legislature has not seen fit to provide sanctions against the adulterous parents — only against their children.”
In Succession of Brown, 888 So.2d 1151 (La.1980), cert. denied, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981), the Louisiana Supreme Court found LSA-C.C. art. 919 to be unconstitutional. That article excluded acknowledged illegitimates from participating in the succession of their father when he was survived by legitimate descendants, ascendants, collateral relatives or a surviving spouse. The court noted that the U.S. Supreme Court had previously found article 919 constitutional, using the test of minimum rationality under the old scheme of equal protection analysis, in Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971). However, the court used the new approach to equal protection analysis of classification based on birth, as set forth in Mathews v. Lucas, supra, which involves using an intermediate level approach. The court analyzed whether LSA-C.C. art. 919 was constitutional by determining whether the classification in art. 919 was substantially related to a permissible state interest.
The three state interests suggested were promotion of legitimate family relationships, the possibilities which the father could have exercised to insure the illegiti-mates a part of the succession and the orderly disposition of property at death. The court dismissed the first two as being rejected by the U.S. Supreme Court in Trimble v. Gordon, supra. The court then went on to discuss the last state interest and cited the holding of Lalli v. Lalli, supra:
[3] The state interest of stable land titles and orderly disposition of property will withstand an equal protection analysis, if the state statute provides the illegitimate some way to obtain equal protection, Lalli.
[4] The requirement of a filiation order during the lifetime of the father was held to be substantially related to the important state interests and, therefore, the statute passed constitutional equal protection muster. Problems such as proof of paternity, service of process, finality of decrees in estate distribution, and spurious claims were all recognized in Lalli, pp. 525-6, and the New York statute requiring proof of filiation before death cured them.
The court went on to state that the Louisiana statute “flatly denied” the illegitimate succession rights if other relatives existed and did not allow the “acknowledged illegitimate to relieve his predicament.” The court found LSA-C.C. art. 919 denied ille-gitimates equal protection.
In Succession of Grice, 462 So.2d 131 (La.1985) the Louisiana Supreme Court found LSA-C.C. art. 209, which requires illegitimate children who would inherit from their fathers by intestate succession to institute filiation proceedings within certain time limitations, passed constitutional muster. In Grice, a thirty-one-year-old woman filed a petition asserting that the decedent was her father and she requested to be appointed provisional administratrix. The district court held for the woman, finding LSA-C.C. art. 209 unconstitutional, and the widow’s writ was granted.
The court focused the issue narrowly:
We are asked to decide whether the requirement of art. 209 that filiation proceedings be brought “within nineteen years of the child’s birth” is substantially related to permissible state interests *1380 when the illegitimate child is seeking paternal inheritance by intestate succession.4
The court then went on to discuss Trimble, supra and Lalli, supra:
[4-6] From Trimble and Lalli, we conclude that (1) the state has a substantial, permissible interest in providing for the just and orderly disposition of property at death where intestate paternal inheritance of illegitimate children is concerned, an area involving unique and difficult problems of proof, and (2) the means adopted by the state to further that interest may result in some inequity and still be constitutional, provided it is substantially related to that interest.
The court continued:
[11,12] Hence, we conclude that (1) the nineteen year limitation contained in La.Civ.Code art. 209(C) is sufficiently long to provide a reasonable opportunity to those with an interest in illegitimate children to bring suit on their behalf and (2) the nineteen year limitation on that opportunity is substantially related to the state’s interest in providing for the just and orderly disposition of a decedent’s property where paternal inheritance is concerned, an area involving unique and difficult problems of proof. We therefore uphold the constitutionality of art. 209 of the Civil Code.12
Several other Louisiana Supreme Court cases have found certain codal provisions to unconstitutionally discriminate against illegitimates. These articles were declared to violate Article 1, Section 3 of the 1974 Louisiana Constitution. Succession of Bartie, 472 So.2d 578 (La.1985) found former LSA-C.C. art. 1493 unconstitutional. That article denied illegitimate descendants a right to a forced portion of their ascendants estate while granting these rights to legitimate descendants. Succession of Thompson, 367 So.2d 796 (La.1979) held former LSA-C.C. art. 1483 unconstitutional. That article prohibited an acknowledged illegitimate child from being a legatee when a parent had legitimate descendants. Jordan v. Cosey, 434 So.2d 386 (La.1983) held former La.Civ.Code art. 1486 unconstitutional. Article 1486 limited the amount an illegitimate child could receive by donation from his natural father to one-fourth of the father’s property, if the father left legitimate ascendants or legitimate siblings.
In the present case the purpose of LSA-C.C. art. 1705, as stated in Succession of Carbajal, supra, is to avoid an unintentional or inadvertent disinheritance of a child born after a testament is executed. The rationale is that the testator intends to provide for all of his children and if he fails to provide for a child born after the testament is signed, the law will presume he did not intend to disinherit that child and will revoke the testament.
The source of article 1705 is not Code Napoleon. 3 Planiol Civil Law Treatise n. 2852 at 391 explains that under the French Code wills were not revocable on grounds of subsequent birth of a child because the testator could always revoke or change his will. Apparently, the source of article 1705 is the common law doctrine of implied revocation of a testamentary bequest. In Capriotti v. Millsaps, 123 Ariz. 281, 599 P.2d 237, 239 (1979) the doctrine is explained as follows:
The common law doctrine of implied revocation of a testamentary bequest is “founded upon the reasonable presumption of an alteration of the testator’s mind, arising from circumstances since the making of the will, producing a change in his previous obligations and duties.... There is not, perhaps any code of civilized jurisprudence in which the doctrine of implied revocation does not exist and apply when the occurrence of new social relations and moral duties raises a necessary presumption of a change of intention in the testator.” 4 Kent’s Commentaries 421-22.
Those circumstances arising after the making of a will which were recognized at common law as invoking the doctrine of implied revocation were the marriage of a woman, 1 Page on Wills § 516 (3d ed. 1941), and the marriage of a man and the birth of a posthumous or pretermit-ted child.
*1381 The succession representative in the present case argues the purpose of article 1705 is to carry out the will of the testator, clearly a legitimate state interest. Kathleen Talley answers by conceding this is a legitimate state interest, but argues article 1705 does not advance this interest because it expressly revokes the will if a legitimate child is born or if an illegitimate child is adopted or legitimated. Moreover, Kathleen argues that if the purpose of the state legislators was merely to protect testaments, article 1705 should never have been adopted.
In our view, the purpose of article 1705, as stated in Succession of Carbajal, supra, is to carry out the presumed intention of the testator where, after the making of his will, his legitimate child is born or his illegitimate child is adopted or legitimated by him. The presumption is that the testator intends to provide for such children and if his will does not do so, it is presumed the omission was inadvertent or unintentional, and the testament is revoked.
We find this is clearly a legitimate state interest. The only serious constitutional question is whether the classification in article 1705 based on illegitimacy is substantially related to this permissible state interest.
In Mills v. Habluetzel, supra, and Lalli v. Lalli, supra, we have seen that illegiti-mates may be treated different than legitimates. The rationale in Mills is that proof of paternity is necessary as to illegitimates but not as to legitimates, since it “is often sketchy and strongly contested and frequently turns upon conflicting testimony from only two witnesses.” This difficulty of proof is the fundamental basis for treating claims by illegitimates different than legitimates. Clearly, this same rationale is the basis for treating illegitimates different than legitimates in article 1705.
The statutory scheme does provide protection for illegitimates. Of course, regardless of the testament, the illegitimate child inherits his forced portion of one-fourth of the testator’s estate under LSA-C.C. arts. 1493 and 1495. If the testator wants the illegitimate child to inherit more, he can make a will accomplishing this purpose. If the testator wants to be sure the illegitimate child will be recognized as his, he can adopt or legitimate the child, but this must be done by the testator before his death. A court judgment of paternity after the testator’s death, as in the present case, will not suffice. This distinction is justified by the difficulty of proving paternity of an illegitimate child after the father’s death. See Lalli v. Lalli, supra.
In the instant case there was previous litigation on the paternity issue. This case illustrates the difficulty of proving paternity and why there is a permissible difference in treatment of illegitimates due to the difficulty of proof of paternity. Article 1705 survives the intermediate test of equal protection and is constitutional. The lower court did not err in holding LSA-C.C. art. 1705 constitutional.
The present case involves the subsequent birth of an illegitimate child of a testator who was the father. We express no opinion as to the result if the testator had been the mother. That issue is not before us.
All costs of this appeal are assessed to plaintiff-appellant, Kathleen Talley.
AFFIRMED.