614 So.2d 55 (1993)
Kathleen TALLEY
v.
SUCCESSION OF James Merkel STUCKEY.
No. 92-C-2298.
Supreme Court of Louisiana.
February 22, 1993.
Dissenting Opinion March 5, 1993.
Rehearing Denied March 25, 1993.
*56 Bob F. Wright, James H. Domengeaux, Domengeaux, Wright, Moroux & Roy, Ted W. Hoyt, Lafayette, for applicant.
Warren D. Rush, Rush, Rush & Calogero, Lafayette, J. Burton Willis, Willis & Willis, St. Martinsville, Gary R. Steckler, Lafayette, Mack E. Barham, Robert E. Arceneaux, Anita M. Warner, Barham & Arceneaux, New Orleans, for respondent.
Dissenting Opinion of Justice Dennis March 5, 1993.
MARCUS, Justice.[*]
James Merkel Stuckey, the deceased testator, was married but once and then to Kathryn Means. No children were born of the marriage. They divorced on August 18, 1975. Subsequently, Mr. Stuckey cohabitated with Kathleen Talley, but they never married and the relationship ended after approximately one year. On November 11, 1984, Ms. Talley gave birth to her only child, Garett Talley. On August 12, 1985, Mr. Stuckey died. Thereafter, in a filiation proceeding instituted by Ms. Talley, Mr. Stuckey was found to be Garett Talley's biological father. Talley v. Stuckey, 560 So.2d 111 (La.App. 3rd Cir.), writ denied, 565 So.2d 458 (La.1990).
While the application for certiorari in the filiation proceeding was pending before this court, Mr. Stuckey's olographic will dated June 18, 1967 was found and probated. The will divided most of Mr. Stuckey's estate between his ex-wife, Kathryn *57 Means, and his mother, Ceola Merkel Stuckey.[1] Kathleen Talley, as natural tutrix for the minor child Garett Talley, brought the present action to annul the probated testament arguing that under La. Civ.Code art. 1705 the testament was revoked by the subsequent birth of the testator's illegitimate child, Garett Talley. Art. 1705 provides:
A testament is revoked by the subsequent birth of a legitimate child to the testator or by the subsequent adoption or legitimation of a child by the testator, unless the testator has made testamentary provision to the contrary or has made testamentary provision for such child.[2]
Ms. Talley challenged the constitutionality of art. 1705 on equal protection grounds contending that the statute discriminated against illegitimates insofar as it did not provide for the revocation of a testament by the subsequent birth of an illegitimate child unless the illegitimate child was legitimated by the testator. The trial judge found that art. 1705 does not unconstitutionally discriminate against illegitimates. Accordingly, he held that the will was valid and should not be annulled due to the subsequent birth of the testator's illegitimate child. The court of appeal affirmed reasoning that the different treatment accorded illegitimates in art. 1705 was justified by the difficulty of proving paternity after the father's death.[3] On plaintiff's application, we granted certiorari to review the correctness of that decision.[4]
The issue for our determination is whether art. 1705 violates the equal protection clause of either the Louisiana or United States Constitution insofar as it does not provide for the revocation of a testament by the subsequent birth of an illegitimate child whose filiation to the testator parent has been established in the manner provided by law and, if so, to determine the appropriate remedy.
The equal protection clause of the Fourteenth Amendment of the United States Constitution and Article 1 § 3 of the Louisiana Constitution provide that no person shall be denied equal protection of the laws. Succession of Grice, 462 So.2d 131 (La.1985). Our state constitution, Article 1 § 3, specifically provides that "[n]o law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth...." We have held that this provision includes within its scope unreasonable discrimination because of illegitimacy. Jordan v. Cosey, 434 So.2d 386 (La.1983). Although classifications based on illegitimacy are not "suspect" or subject to "strict scrutiny" under equal protection analysis, the scrutiny applied to them "is not a toothless one." Succession of Grice, 462 So.2d at 133 (quoting Trimble v. Gordon, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977); and Mathews v. Lucas, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976)). Such classifications are unconstitutional unless they are substantially related to permissible state interests. Succession of Grice, 462 So.2d at 133.
The overriding purpose of art. 1705 is to effectuate the presumed intent of the testator. That is, art. 1705 "is founded upon the presumption that a testator does not want his will to stand if a child is born to him after he has made the will, who is not provided for in the will." Succession of Carbajal, 154 La. 1060, 98 So. 666, 668 (1923) (quoting Succession of Senac, 2 Rob. 258 (La.1984)). However, in determining the constitutionality of a statute that treats illegitimates differently from other classifications of persons, equal protection analysis is not concerned with the general purpose of the statute. Rather, the focus *58 is on the state interest purportedly promoted by treating illegitimates differently. See Trimble v. Gordon, 430 U.S. at 773-74, 97 S.Ct. at 1466-67. Accordingly, we must first ascertain why the legislature excluded illegitimates from the benefits of art. 1705. In doing so, we draw guidance from the context of art. 1705's legislative history.
Prior to its amendment in 1974, art. 1705 provided that "[a] testament is revoked by the posterior birth of a child to the testator...." La.Acts 1966, No. 471, § 1 (emphasis added). At the time, it was unnecessary to qualify the status of a child whose subsequent birth would revoke a testament because illegitimate children could not inherit intestate. Then, in the wake of adoption of the Constitution of 1974 and its implicit protection of illegitimates, art. 1705 was amended and the potentially constitutionally infirm word "legitimate" was added before the word "child" thereby excluding illegitimate children from the benefits of art. 1705. La.Acts 1974, No. 209, § 1. At the time, the state lacked a procedure for establishing the method and burden of proof in filiation proceedings[5] and, most importantly, a time period for an unacknowledged illegitimate to bring such a proceeding. Consequently, spurious and belated claims by illegitimate children threatened the orderly disposition of property at death, particularly, where an illegitimate sought intestate paternal inheritance, an area involving unique and difficult problems of proof. See Succession of Grice, 462 So.2d 131, 134 (La.1985). Under the circumstances, we do not believe that the legislature denied illegitimates the benefits of art. 1705 because it presumed that a testator would intend to discriminate against his illegitimate children. Rather, we believe that illegitimates were excluded from art. 1705 because of the state's concern for the orderly disposition of property at death.
Thus, our inquiry is narrowed. We must determine whether the different treatment accorded illegitimates in art. 1705, that is, not providing for the revocation of a testament by the subsequent birth of an illegitimate child filiated in the manner provided by law as opposed to a legitimate, adopted, or legitimated child, is substantially related to the state's legitimate interest in the orderly disposition of property at death. Again, we are guided by legislative history.
In 1980, civil code articles 208 and 209 were amended to provide a burden and method of proof in filiation proceedings and to provide a peremptive period for filing such claims.[6] In 1982, art. 209 was further amended to increase the burden of proof from a mere "preponderance of the evidence" to the stricter standard of "clear and convincing evidence" for an illegitimate child attempting to prove parental descent after the alleged parent has died. La. Acts 1982, No. 527, eff. Sept. 10, 1982. Thus, arts. 208 and 209 have provided a procedure for protecting the orderly disposition of property at death by controlling *59 spurious and belated claims brought by unacknowledged illegitimate children. See Succession of Clivens, 426 So.2d 585, 596-97 (La.1983) (on rehearing). In light of the amendments to art. 208 and, particularly, art. 209, we find the state's interest in the orderly disposition of property at death is not substantially related to the different treatment accorded illegitimates in art. 1705. Therefore, we hold that the presence of the word "legitimate" in art. 1705 renders the statute unconstitutional insofar as it excludes from its benefits an illegitimate child whose filiation has been established to the testator parent in the manner provided by law.[7]
Where a statute is found constitutionally defective on equal protection grounds because of underinclusion a court may invalidate the entire statute or save the statute by extending its benefits to the aggrieved excluded class. Welsh v. United States, 398 U.S. 333, 361, 90 S.Ct. 1792, 1807-08, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring); Moritz v. Comm'r of Internal Revenue, 469 F.2d 466 (10th Cir.1972), cert. denied, 412 U.S. 906, 93 S.Ct. 2291, 36 L.Ed.2d 971 (1973); and Deborah Beers, Comment, Extension versus Invalidation of Underinclusive Statutes: A Remedial Alternative, 12 Colum. J.L. & Soc. Probs. 115, 116 (1975); see Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968), on remand, 253 La. 73, 216 So.2d 818 (1968). Factors to consider in determining the appropriate remedy include: the importance of the statute and its severability, the disruption to the statutory scheme that would occur by extension, and whether the statute confers a benefit or imposes a burden. See Beers, supra, at 117.
Severability, the most important factor, is principally a question of legislative intent. See State v. Cox, 352 So.2d 638, 643 (La.1977). We have held that the presence of a severability clause is an admonition to the court of the intention that all valid provisions be retained in full effect, even though some provisions thereof be held invalid, and hence creates a presumption of severability in fact. State v. Brown, 389 So.2d 48, 51 (La.1980). La. Acts 1974, No. 209, which amended and reenacted art. 1705, contained the following severability clause:
If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items or applications of this Act which can be given effect without the invalid provisions, items or applications, and to this end the provisions of this Act are hereby declared severable.
This broad severability clause strongly indicates that the legislature would have this court leave as much of art. 1705 intact as possible.
A severability clause alone will not save a statute from total invalidation. The test for severability is whether the unconstitutional portions of the statute are so interrelated and connected with the constitutional parts that they cannot be separated without destroying the intention manifested by the legislature in passing the act. If the remaining portion of the statute is severable from the offending portion, this court may strike only the offending portion and leave the remainder intact. State v. Azar, 539 So.2d 1222, 1226 (La. 1989). In fact, "whenever a statute contains an objectionable provision severable from those found to be unconstitutional, it is the duty of the court to so declare and to maintain the act insofar as it is valid." Cox, 352 So.2d at 642 (emphasis added). Where, as here, a single word is found offensive and that word was added to the statute as part of an act containing a severability clause, that word alone may be declared invalid and the remainder of the statute held to be constitutional. Brown, 389 So.2d at 51. Absent the constitutionally deficient word "legitimate," art. 1705 provides that "[a] testament is revoked by the subsequent birth of a ... child to the testator or by the subsequent adoption or legitimation of a child by the testator...." *60 (emphasis added). Under La.Civ.Code art. 3506(8), the word "child" includes illegitimate children, like Garett Talley, whose filiation has been established in the manner provided by law. Considering this specific definition of "child," we are convinced that the remainder of the statute is independent of the invalid portion and can stand as a complete and purposeful act. Additionally, it is clear that the legislative goal of effectuating the presumed intent of a testator without disrupting the orderly disposition of property at death can be accomplished after striking the word "legitimate," particularly in light of the subsequent amendments to civil code arts. 208 and 209. Accordingly, we find that the legislature would have enacted art. 1705 without the offending classification. We therefore conclude that the word "legitimate" is severable from art. 1705 and that the remainder of the statute can stand.
In reviewing the importance of art. 1705, we note that this state has a longstanding policy of effectuating the presumed intent of a testator by revoking a testament due to the subsequent birth of a child. Article 1705 was adopted from La.Civ.Code art. 1698 in the Code of 1825. The article was not taken from the Code Napoleon, but perhaps from the Partidas, book 6, law 20, title 1. Succession of Carre, 212 La. 839, 33 So.2d 655 (1948). When a policy has roots deeply embedded in history, there is a compelling reason for a court to cure the defect of underinclusion by extending the statutory benefits. See Welsh, 398 U.S. at 366, 90 S.Ct. at 1810. We believe that the over 150 years history of art. 1705 coupled with the ability to enforce the statute as severed without impairing other state goals such as the orderly disposition of property at death lend strong support for the conclusion that the appropriate remedy in this case is to extend the benefits of art. 1705 to illegitimates filiated in the manner provided by law.
Next, we consider the disruption to the statutory scheme that occurs by extension. Whether we extend the benefits of art. 1705 or not, an unacknowledged illegitimate who seeks to inherit from a testator must institute filiation proceedings.[8] Hence, extending art. 1705 will not lead to an increase in succession related procedures. Moreover, extending the benefits of art. 1705 should be easy to administer since, as previously discussed, the legislature has controlled spurious and belated claims by unacknowledged illegitimates through arts. 208 and 209.
Additionally, when statutory classifications are challenged on equal protection grounds, courts are much more likely to extend a benefit to a previously excluded class than to burden a previously exempt class. Beers, supra, at 134.[9] For instance, in Levy v. Louisiana, supra, the United States Supreme Court held that judicial interpretation of the word "child" in the Louisiana Wrongful Death Statute, La.Civ. Code art. 2315 (West 1979), which excluded illegitimate children and, consequently, denied illegitimate children a right of action for the wrongful death of their mother violated the equal protection clause of the fourteenth amendment of the federal constitution. The Court did not declare the wrongful death statute unconstitutional. Instead, the right of action was extended to illegitimates. Id. Similarly, in the companion case of Glona v. American Guarantee *61 & Liability Ins. Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968), the Court extended to mothers of illegitimate children the right to sue under Louisiana's Wrongful Death Statute for an illegitimate child's wrongful death. Like Levy and Glona, extension in the present case benefits a previously excluded class.
In sum, art. 1705 is unconstitutional insofar as it discriminates against illegitimates filiated in the manner provided by law. We conclude that the appropriate remedy is to extend the benefit of art. 1705 to illegitimates filiated in the manner provided by law by severing the constitutionally deficient word "legitimate." Accordingly, the courts below erred in holding that art. 1705 did not unconstitutionally discriminate against illegitimates filiated in the manner provided by law. They further erred in failing to revoke the will due to the subsequent birth of the testator's illegitimate child, Garett Talley, who had proven filiation.

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed and set aside. Judgment is rendered in favor of Kathleen Talley, as natural tutrix of Garett Talley, declaring that the testament of James Merkel Stuckey dated June 18, 1967 is hereby revoked. Case remanded to the district court for further proceedings in accordance with the law.
WATSON, J., dissents.
DENNIS, J., dissents with reasons.
DENNIS, Justice, dissenting.
I respectfully dissent.
Civil Code article 1705 cannot be applied constitutionally to prevent, as a matter of law, an illegitimate child from rebutting the statutory presumption that the testator would not wish the illegitimate's post-testament birth to revoke a will. However, even when arbitrarily applied, Article 1705 may operate only to deprive an illegitimate of equal protection as to an important contingent right, rather than as to a vested fundamental right. Therefore, I cannot agree with the majority's drastic invalidation of the statute and strict remedy of rewriting the law to completely reverse the presumption established by the legislature. Instead, I would use an intermediate review approach and likewise apply an intermediate remedy, viz., by construing Article 1705 as establishing only a rebuttable presumption that the testator would wish his testament to be maintained despite the subsequent birth of his illegitimate child.
The statute in question, Civil Code article 1705, does not deprive an illegitimate child of his basic right of inheritance from his natural parent. His right to inherit a portion of his parent's estate under forced heirship laws cannot be defeated or impinged upon by his parent's testament. It is only the child's interest in the disposable portion of his parent's estate that can be affected by the provisions of Article 1705. This interest of the child, whether he be legitimate or illegitimate, is only a contingent interest, because it is clear and undisputed that the testator has the right to bequeath the disposable portion to whomever he chooses. Therefore, the interest of an illegitimate child that may be affected by Civil Code article 1705 is an important but not constitutionally fundamental interest.
Article 1705 ostensibly creates and implements a series of irrebuttable presumptions as to a testator's wishes and intentions in the event he becomes the parent of a child after making the will: First, that the testator would want his will revoked by the subsequent birth of a legitimate child, adoption of a child, or legitimation of a child, unless the testator has provided for the child or ruled out such a revocation in this will; second, that the testator would not intend for his will to be revoked by the subsequent birth of an illegitimate child.
Under both federal and state equal protection guarantees, legislation that burdens quasi-suspect classifications such as gender, illegitimacy, age, and handicap and invoke important but not constitutionally fundamental interests, trigger a heightened form of review, in fact poised between the toothless invocation of minimum rationality *62 and the nearly fatal invocation of strict scrutiny. See L. Tribe, American Constitutional Law § 16-32 (2d ed. 1988); Sibley v. Bd. of Supervisors, 477 So.2d 1094, 1107-08 (La.1985) (on rehearing); Butler v. Flint Goodrich Hospital of Dillard University, 607 So.2d 517, 523-24 (La. 1992) (Dennis, J., dissenting). To withstand this heightened scrutiny, the proponent of the legislation must show that the classification substantially furthers an appropriate governmental objective. Sibley v. Bd. of Supervisors, supra. See also Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La. L.Rev. 1, 6 (1974).
In the instant case, the proponent has adequately proven that the state's legitimate objective in enacting Article 1705 was to create a series of presumptions regulating testamentary revocation and to thereby give effect to the testator's intent. However, if the presumption affecting illegitimates adversely is construed to be irrebuttable and so applied, it would discriminate against those illegitimates whose natural parents would not have wished to slight them and thus in part further no legitimate state interest. But if the presumption is interpreted and applied as a rebuttable presumption, it would further a legitimate state purpose, viz., enforcing the probable intent of testators in the event of the subsequent birth of an illegitimate child.
When intermediate review is employed, a variety of intermediate remedies may be considered. The most common intermediate remedy is that of requiring the court or other decisionmaker to permit rebuttal in an individualized hearing and thus to allow exception to the general rule espoused in the statute, transforming it from an "irrebuttable presumption" to a burden-shifting device. See Tribe, supra at § 16-34, citing authorities. Requiring that a rule be made permeable to rebuttalthat individuals subject to its terms be given such an opportunity to convince the court or other relevant decisionmaker that they ought to prevail notwithstanding a generally rational per se ruleis best understood as one among several possible ways of proceeding when a rule seems unconstitutionally harsh in its remorseless enforcement but is not so clearly invalid in all possible applications as to warrant a simple adjudication of unconstitutionality. Id. See, e.g., Trimble v. Gordon, 430 U.S. 762, 770-71, 97 S.Ct. 1459, 1465, 52 L.Ed.2d 31 (1977) (explaining need "to consider the possibility of a middle ground between the extremes of complete exclusion and case-by-case determination of paternity."); see also U.S. Dept. of Agriculture v. Murry, 413 U.S. 508, 519, 93 S.Ct. 2832, 2838, 37 L.Ed.2d 767 (1973) (Marshall, J., concurring).
This intermediate remedial technique became well established in a series of decisions stretching from the early 1940's to the late 1960's, in which the United States Supreme Court expressed its invalidation of various per se rules in opinions condemning the irrebuttable presumptions that such rules embodied. Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (sterilization of per se class of criminals); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (per se classification of military personnel as nonresidents); Weber v. Aetna Cas. & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (illegitimate entitled to show economic dependence for purpose of worker's compensation benefits); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (unwed fathers may show fitness for custody); Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (student residency status); Cleveland Bd. of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (fitness to teach publicly beyond fourth pregnancy month); Tribe, supra at § 16-34.
Applying the intermediate review and remedy principles, I agree that an irrebuttable presumption against testamentary revocation because of the subsequent birth of an illegitimate child arbitrarily forecloses proof that testators in a substantial number of cases would in fact wish their wills to be set aside for the benefit of their natural children. But at the same time it is not unreasonable to presume that at least a significantly large number of testators *63 would choose to have their wills remain intact and effective despite the subsequent birth of an illegitimate childkeeping in mind that the illegitimate children are by law assured equal treatment regarding the forced portion of the estate. Therefore, the rule of Civil Code article 1705, with respect to illegitimates is similar to other rules to which the courts have applied intermediate remedies. Its rigid enforcement in every case seems excessively harsh, but it is not so clearly invalid in all possible applications as to warrant a more invasive adjudication of unconstitutionality.
Accordingly, I would opt for a less drastic form of invalidation than the majority has chosen. By completely reversing the legislative intent and by creating an irrebuttable presumption that all testators would wish their wills revoked by the subsequent birth of an illegitimate child, the majority has adopted a rule that seems even more arbitrary and less consistent with the likely intention of most testators than the legislated law. In my opinion, the potential arbitrary discriminatory effects of Article 1705 should be eliminated by a more moderate form of intermediate remedy, viz., that of requiring the courts to permit rebuttal of the statutory presumption in individualized hearings, thus allowing exceptions to the general rule of non-revocation and transforming the irrebuttable presumption of Civil Code article 1705 into a burden-shifting device. In this fashion, the illegitimate child is given an opportunity to show that he is entitled to have the testament revoked and thereby to have a greater share than a forced portion of the estate. Moreover, the least drastic invalidation is precisely the remedy called for by the legislature in the severability clause applicable to Article 1705: "If ... the application thereof is held invalid, such invalidity shall not affect other ... applications of this Act which can be given effect without the invalid provisions...." La.Acts 1974, No. 209.
In summary, I agree that Civil Code article 1705 is unconstitutional when applied as an irrebuttable presumption to bar absolutely the revocation of wills by the subsequent birth of an illegitimate child, but I disagree with the drastic remedy employed by the majority, i.e., the judicial creation of the opposite irrebuttable presumption that testators wish and intend for their wills to be entirely invalidated by such subsequent births. Instead, the statutory presumption should be applied as a rebuttable rather an irrebuttable presumption.
NOTES
[*] Calogero, C.J., not on panel, recused.
[1] On March 18, 1986, Ceola Merkel Stuckey died testate bequeathing practically all immovable property inherited from James Merkel Stuckey to Estelle Roulay Barras, Ceola's former sister-in-law and Mr. Stuckey's aunt, and naming Estelle Barras executrix of her succession. Additionally, after Ceola Stuckey's death, Estelle Barras was substituted as dative testamentary executrix of Mr. Stuckey's succession.
[2] Art. 1705 was amended and reenacted by La. Acts 1974, No. 209, to read as provided above.
[3] 604 So.2d 1375 (La.App. 3d Cir.1992).
[4] 607 So.2d 547 (La.1992).
[5] Prior to the 1980 amendment of civil code articles 208 and 209, "filiation outside of marriage depended primarily upon the reputed father's voluntary admission, either express or tacit, of paternity." Charles R. Penot, Comment, Succession Rights of Illegitimates in Louisiana, 27 Loy.L.Rev. 237, 241 (1981) (quoting Spaht & Shaw, The Strongest Presumption Challenged: Speculations on Warren v. Richard and Succession of Mitchell, 37 La.L.Rev. 59, 66 (1976)).
[6] Art. 209 was amended and reenacted by La. Acts 1980, No. 549, eff. Sept. 12, 1980, to provide a procedure and time limitations for proceedings to establish filiation and to provide that failure to timely institute such a proceeding would bar the claims of such persons in the successions of their alleged parents. Under the act, the filiation proceeding had to be instituted within six months of the death of the alleged parent or nineteen years from the child's birth, whichever occurred first. Section 4 provided, however, that any illegitimate child nineteen years or older would have one year from the effective date of the act to bring a civil proceeding to establish filiation.

Art. 209 was further amended by La.Acts 1981, No. 720, eff. Sept. 11, 1981, which extended the peremptive period by according the unacknowledged illegitimate one year after the death of the alleged parent or nineteen years from the child's birth to institute filiation proceedings. Additionally, unacknowledged illegitimate children whose right to institute a filiation proceeding had expired on July 23, 1981 under the previous act, were granted an additional year to institute filiation proceedings. Succession of Grice, 462 So.2d at 133.
[7] Since we have found that this invidious discrimination is barred by our state constitution, we need not address whether art. 1705 violates federal constitutional guarantees of equal protection.
[8] Assuming, of course, that the testator has not bequeathed to the unacknowledged illegitimate an amount sufficient to satisfy the forced portion.
[9] See, e.g., Richardson v. Davis, 409 U.S. 1069, 93 S.Ct. 678, 34 L.Ed.2d 659, aff'g mem., 342 F.Supp. 588 (D.Conn.1972) (extended social security death benefits to wage earner's illegitimate children); Weinberger v. Wiesenfeld, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) (extended to widowers social security benefits previously available only to widows and minor children); Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (dependency benefits extended to husbands of servicewomen in same manner as provided to wives of servicemen); Moritz v. Comm'r of Internal Revenue, 469 F.2d 466 (10th Cir.1972), cert. denied, 412 U.S. 906, 93 S.Ct. 2291, 36 L.Ed.2d 971 (1973) (extended to bachelors a tax deduction for care of dependents living in the home); and Wattigny v. Louisiana, 257 La. 945, 244 So.2d 842 (1971) (statute purporting to set uniform salaries for sheriffs based on parish population was extended to sheriff of specifically excluded parish).